Points decided.

[No. 2,753.]

# THE PEOPLE OF THE STATE OF CALIFORNIA *v.* AH SAM.

INDICTMENT FOR POSSESSING UNFINISHED FORGED BANK BILLS—Two DESCRIPTIONS OF SAME OFFENSE.—In a criminal case, under the seventy-sixth section of the Act concerning crimes and punishments, the indictment in one count charged the defendant with having in his possession "five hundred certain false, forged, and counterfeit blank and unfinished bank bills, each made in the form and similitude of a bill for the payment of money made to be issued by  *  *  *  the Chartered Bank of India, Australia, and China, a foreign corporation then lawfully organized and incorporated under the laws of the United Kingdom of Great Britain and Ireland," doing business at Hongkong, with intent to procure the bills to be finished in order to utter them as genuine bills, and defraud the said bank. In a second count, which was preceded by a statement that the offense charged therein was the same as that described in the first count, it charged that the bills were in the form and similitude of bills for the payment of property. *Held*, that it was but a different description of the same offense, and that there was nothing repugnant in saying that the unfinished bills have the form and similitude of those which have been finished.

MOTION DEFINED, AND HOW MADE.—A motion is an application for a rule or order made *viva voce* to a Court or Judge. Making out and filing a written application for such rule or order is not sufficient. The attention of the Court must be called to it, and the Court moved to grant it.

MOTION FOR NEW TRIAL.—A motion for a new trial must be made *viva voce*, and, if desired, the grounds of the motion and the rulings of the Court thereon may be embodied in a bill of exceptions, and can be reviewed by the Supreme Court in no other way.

CHARGE AS TO INCORPORATION IN INDICTMENT FOR POSSESSING COUNTERFEIT NOTES.—In an indictment for possessing counterfeit notes with intent to utter them, if the legal existence of the corporation be not made an issue, it is not necessary to charge that the banking house whose bills have been imitated was an incorporated company. It would be equally an offense whether the company be actually incorporated or not, so it is acting as a corporation, and issues bank bills which are current anywhere.

PROOF OF INCORPORATION BY REPUTATION.—Where an indictment for possessing counterfeit bills charged that the bills were in the form of the bills of an incorporated banking company, doing business in Hongkong: *held*, that it was competent to prove by reputation the existence and incorporation of the company.

GUILTY POSSESSION OF COUNTERFEIT NOTES.—To constitute the crime of possessing forged notes with intent to pass them, the law only requires the

guilty possession. It is not necessary that the intent to fill up unfinished notes should be proven by an attempt to do so. Possession, with knowledge of the purpose for which they are designed, is sufficient.

APPEAL from the Municipal Criminal Court of the City and County of San Francisco.

The facts are stated in the opinion. The indictment was as follows:

Ah Tuck and Ah Sam are accused by the Grand Jury of the City and County of San Francisco, State of California, by this indictment, found this 25th day of August, A. D. 1870, of the crime of forgery, committed as follows: The said Ah Tuck and Ah Sam, on the 9th day of July, A. D. 1870, at the city, county, and State aforesaid, feloniously, falsely, and willfully did have and keep in their possession five hundred certain false, forged, and counterfeit blank and unfinished bank bills, each made in the form and similitude of a bill for the payment of money, made to be issued by an incorporated bank, viz: The Chartered Bank of India, Australia, and China, a foreign corporation then lawfully organized and incorporated under the laws of the United Kingdom of Great Britain and Ireland, and then carrying on business as such banking corporation at Hongkong, in China, which said five hundred unfinished bank bills so had and kept in the possession of the said Ah Tuck and Ah Sam are each in the words and figures following, viz:

$5.　　　　INCORPORATED BY ROYAL CHARTER.　　　　$5.
No.——　　　　　　　　　　　　　　　　　　　No.——
　　　　　　　　　　　HONGKONG, ——, 18—.

The Chartered Bank of India, Australia, and China promises to pay the bearer, on demand, at its office here, five dollars or the equivalent in the currency of the island, value received.

By order of the Court of Directors.

Entered ——.     Acc't ——.

——, Manager.

HONGKONG.

With intention to fill up said blank and unfinished bills, and permit, cause, and procure the same to be filled up and completed in order to utter and pass the same and to cause the same to be uttered and passed as true and genuine bills of said corporation, to defraud said The Chartered Bank of India, Australia, and China, contrary to the form of the statute in such case made and provided. .

And in order to charge the commission of the said crime of forgery in another count and in a different way, the said Grand Jury accuse the said Ah Tuck and Ah Sam of the said crime of forgery, committed as follows, viz: The said Ah Tuck and Ah Sam, on the 9th day of July, A. D. 1870, at the City and County of San Francisco aforesaid, feloniously, falsely, and willfully did have and keep in their possession the said five hundred false, forged, and counterfeit blank and unfinished bank bills, each made in the form and similitude of a bill for the payment of property made to be issued by an incorporated bank, viz: The Chartered Bank of India, Australia, and China, a foreign corporation then organized and lawfully incorporated under the laws of the United Kingdom of Great Britain and Ireland, and then carrying on business as such banking corporation at Hongkong, in China; which said five hundred blank and unfinished counterfeit bank bills so had and kept by the said Ah Tuck and Ah Sam in their possession are each in the words and figures following, viz:

$5.     INCORPORATED BY ROYAL CHARTER.     $5.

No.——                                                    No.——

HONGKONG, ——, 18—.

The Chartered Bank of India, Australia, and China, promises to pay the bearer, on demand, at its office here,

five dollars, or the equivalent in the currency of the island, value received.

By order of the Court of Directors.

Entered ——.    Acc't ——.

——, Manager.

HONGKONG.

With intention to fill up said blank and unfinished bills, and permit, cause, and procure the same to be filled up and completed, in order to utter and pass the same and to cause the same to be uttered and passed as true and genuine bills of said corporation, to defraud said The Chartered Bank of India, Australia, and China, contrary to the form, force, and effect of the statute in such case made and provided, and against the peace and dignity of the people of the State of California.

*Darwin & Murphy,* for Appellant.

*Attorney General Jo Hamilton,* for Respondent.

By the Court, TEMPLE, J.:

The defendant was indicted jointly with one Ah Tuck, under the seventy-sixth section of the Act concerning crimes and punishments, for having in his possession blank and unfinished bank bills, in the form and similitude of a bill for the payment of money, made to be issued by a corporate bank, to wit: The Chartered Bank of India, Australia, and China, being a corporation doing business at Hongkong, with intent to fill up and complete the same, or to cause it to be done, and to pass or cause them to be passed, etc.

The defendant having been convicted, on motion in arrest of judgment made several objections to the sufficiency of the indictment. The first is, that the indictment charges two offenses. It is in two counts, but in the second it refers to the first, as recommended in *People* v. *Thompson,* 28 Cal.

214, in such manner as to identify the offense as the same already described. And besides, the second count is preceded by a statement that the offense therein described is the same. In the first count the defendant is charged with having in his possession blanks in the form and similitude of bills made, etc., for the payment of money; in the second it is charged that they were in the form and similitude of bills for the payment of property. This is evidently but a different description of the same offense, and was probably designed to meet a doubt in the mind of the prosecutor as to whether the blank bill was in legal effect a bill for the payment of money or property—it being for the payment of five dollars or its equivalent in the currency of the island. Nor is either count in the indictment repugnant in itself. The statute describes the offense as having in possession blanks having the form or similitude of bills for the payment of money or property, made to be issued, etc. The indictment substantially follows the language of the statute. The resemblance required is of blank bills to those which are finished and completed by the bank, excepting, of course, that the blanks are not filled. Nor does the fact that they have the form and similitude of bills made to be issued imply that they are finished. There is nothing repugnant in saying that the unfinished bills have the form and similitude of those which have been finished.

It is unnecessary to discuss the question whether the statement in the first count, that the blank was in the form of a bill for the payment of money, or the statement in the second count, that the blank had the similitude of a bill for the payment of property, is inconsistent with the blank which is set out in the indictment. Under our statute the different counts contained in the indictment neither in fact nor in theory state different offenses. The two counts are but dif-

ferent narratives of the same acts constituting the offense. They are added either through a doubt as to the legal effect of certain facts or to avoid a possible variance between the allegations and the proof.

The supposed repugnance is one of description merely, and the copy of the blank being set out, the party could not be injured by a mistake as to its legal effect. The main purpose of the two counts, as we have said, was probably to meet this doubt, and if the statement in one count in this respect is incorrect, the other must be correct. We think the motion in arrest of judgment was properly overruled.

After the motion for an arrest of judgment had been denied, the defendant moved the Court for a new trial. The minutes of the Clerk show that "the defendant, by his counsel, moved the Court for a new trial, and filed in writing his grounds thereof." Whereupon it was ordered, that the motion for a new trial be stricken from the files, the defendant, by his counsel, excepting. The motion for a new trial was then denied. These facts appear in the minutes of the Clerk and not in the bill of exceptions. The order striking the "motion for a new trial" from the files is earnestly insisted upon as error here, and we shall consider it without passing upon the question whether it is properly brought up.

A motion is properly an application for a rule or order, made viva voce to a Court or Judge. It is distinguished from the more formal applications for relief by petition or complaint. The grounds of the motion are often required to be stated in writing and filed. In practice the form of the application itself is often reduced to writing and filed. But making out and filing the application itself is not to make the motion.

If nothing more were done, it would not be error in the Court to entirely ignore the proceeding. The attention of the Court must be called to it. The Court must be moved

to grant the order. (3 Stephens' Com. 679; Burrill's Law Dict., word "Motion.")

The statute neither required nor authorized this motion to be made in writing. It must be made viva voce, and, if desired, the grounds of the motion and the ruling may be embodied in a bill of exceptions, and can be reviewed here in no other way. The form of the application filed would not be evidence to us of the application or motion actually made. Again, the "motion," or the grounds of the motion which was filed, do not appear in the transcript. It may have contained matter disrespectful to the Court, or a brief with which the record should not be incumbered. If the document were unexceptional in every respect, we see no harm in allowing it to be filed; and, on the other hand, the refusal could not possibly injure the defendant. In that view the controversy appears, to some extent, to be a personal one between the counsel and the Court, in which no rights of the defendant or the people are involved. There was no error in refusing to allow the document to be filed.

The next question is one of greater importance and of much more difficulty. The indictment charges the defendant with feloniously having in possession certain blank and unfinished bills in the form and similitude of a bill for the payment of money, to be issued by an incorporated bank, viz: The Chartered Bank of India, Australia, and China, a foreign corporation then lawfully organized and incorporated under the laws of the United Kingdom of Great Britain and Ireland, and then carrying on business as such banking corporation at Hongkong, in China, etc., with intent, etc., to defraud the said The Chartered Bank of India, Australia, and China. On the trial, the prosecution was permitted to prove the existence of The Chartered Bank of India, etc., by reputation, that it was acting as a corporation and as a banking house, and as such issued bank bills, which were received as current in certain countries.

The materiality of the evidence, if it be material, arises entirely from the unnecessary allegations of the indictment. It was not necessary to charge that the banking house whose bills were imitated, was an incorporated company. If it were a banking company, actually issuing bank bills, which were current anywhere, it is sufficient. The corporate character of the company is supposed to become material just as, in an indictment for stealing a *black* horse, though it was unnecessary to aver that the horse was black, yet it being averred it becomes material, in order to establish the identity of the crime. So, here, the fact that the company was incorporated becomes material only as a matter of description, and is not an element of the crime. We do not admit the justice of the comparison. It would be equally an offense whether the company be actually incorporated or not, so it is acting as a corporation and issues bank bills which are current. So, too, as a matter of identity, we think the description is satisfied by proof that the company is known as a corporate company and is acting as such, and as such issues bills which come within the statute. The case is widely different where a suit is pending, in which the legal existence of the corporation may be made an issue. (*U. S.* v. *Amedy*, 11 Wheat. 392; *People* v. *Frank*, 28 Cal. 507.)

But admitting that, under the averments in the indictment, it became material to prove that The Chartered Bank of India, Australia, and China was an incorporated company, we think the proof offered and received for that purpose was competent. It is enacted in the seventy-ninth section of the Act concerning crimes and punishments, that upon the trial of any person for forging the bill or note of an incorporated company or bank, or for passing, or attempting to pass, or having in possession with intent to pass, such bills, the incorporation of such company or bank may be proved by general reputation. This section does not include the particular offense charged in this indictment; but the

inference cannot be, therefore, drawn that it was the inten
tion of the Legislature that such evidence should not be
competent in this class of cases. The special mention of
certain offenses in the statute is evidence that the law was
not intended to apply to others; but cannot be understood
as equivalent to a positive provision, that a different rule
shall prevail in other cases. Statutes prescribing rules of
evidence are not always designed to effect a change in the
common law rules. They may be intended to declare what
the common law is, for the purpose, merely, of making that
certain which before was doubtful. Such, we think, was
the object of the statute; and the particular offense charged
in this indictment was, no doubt, omitted from the list of
the more important kindred offenses by mere oversight.
We can conceive of no possible reason why any distinction
should be made.

The decisions upon the subject are conflicting. Many of
the earlier cases hold that in all cases where it becomes
material to prove a foreign corporation, it can only be done
in the same way as any foreign law or statute is proven.
(*Stone* v. *State*, 20 N. J. 401.)

This is undoubtedly the rule in civil cases, where the fact
of the legal existence of the corporation is in issue. But
in criminal prosecutions a different rule has generally been
adopted, and, we think, now universally prevails. In such
cases there is no presumption that there is better evidence
in the possession of the party offering it, which he with-
holds. The defendant is entitled to a speedy trial; and the
ends of justice would be entirely defeated if such evidence
were necessary. Besides, such evidence would be equally
necessary on the preliminary examination, or before the
Grand Jury, or in any proceeding to prevent the commission
of the crime. It is said, also, that the fact that bills are
forged upon a bank purporting to be incorporated, raises a
presumption that it is so. It is a sort of an admission, on

the part of the wrong-doer, of the character of the person against whom the crime is committed. Proof by reputation in such matters is not very liable to lead to error. If the bills of a company purporting to be incorporated are generally received, and passed as current, it is very strong, though not conclusive, evidence that the company is incorporated. Such evidence is received on the same principle that it is permitted to prove that the signatures to a forged bank bill are not genuine, by experts, without calling the officers themselves, or any person who has seen them write. It is necessary to receive such proof in furtherance of justice. It is very analogous to the rule which allows a party to prove the official character of an officer, by proving that he has acted as such. The existence and character of a bank is generally as well known where its bills are current as the fact that one acting as Constable rightfully performs such functions. The views here expressed are, we think, fully sustained by the following authorities: *People* v. *Davis*, 21 Wend. 309; *Saser* v. *State of Ohio*, 13 Ohio, 453; *Reed* v. *State of Ohio*, 15 Ohio, 217; *Denio* v. *People*, 1 Parker's Crim. Cases, 469.

We think the preponderance of authority decidedly in favor of the competency of the evidence; but if it presented only a case where the decisions were conflicting, we should decide in favor of the rule adopted by the statute in kindred cases.

There is but one other question in this case which we think it worth while to notice. That arises upon this state of facts, as appears from the bill of exceptions: The blanks, the possession of which is charged in the indictment, were printed by one Baker, who, before printing them, revealed the matter to the city police, and had an arrangement with them by which the police should be in ambush, ready to seize the defendants and the blanks immediately after they had been handed to them by Baker. Baker had from the police assur-

ances that the blanks would be paid for, and without such assurances he would not have printed them. The ambush was laid according to the arrangement, and upon a signal being given by Baker, according to an understanding between him and the police, the latter appeared and seized Ah Sam and Ah Tuck, and took from them the impressions soon after they had come into their hands.

It is claimed that the defendants never had such a possession of the blanks as is contemplated by the statute; that they were printed for the police, under a contract with them, and were really delivered to them according to contract, and were the property of the police; that the mere handing of them to the defendants, to be immediately taken away by the real owners, was no more than laying them upon a counter for them to take. They were given to the defendants at the request of the police, and remained, during all the time they were in defendants' hands, completely under the control of the police; that the defendants did not have them as their property, and, during the time they held them, could not have intended to pass them; that they must have had the ability to commit the offense, as well as the intention, and that ability they never had any more than they would have when immured in a dungeon; that the intention meant by the statute is potential, and not a mere desire which there are no means to effectuate, and which does not, and cannot, result in any act; that Baker and the police never parted with the possession of the blanks, but determined not to do so, and all the time supervised the handling of them by the defendants.

The police laws cannot be tested by any such metaphysical niceties as these. The problem proposed is similar, if not the same, as that which has baffled the best intellects of the world of all ages, in attempting to reconcile the foreknowledge and providence of divinity with the freedom and the moral responsibility of man. The law adopts the theory of

the responsibility of man, notwithstanding the controlling supervision of Providence.

The defendants were not under duress, nor compelled by the police, prior to the arrest, to do anything whatever. They contracted with Baker for the blanks as freely and as completely as though the authorities had not permitted him to do so. They had absolute control of their own actions when they received the blanks, and up to the very time they were arrested. The knowledge or intention of the police did not interfere with their freedom prior to that time. They had the ability to commit the crime as fully as they would have had if the police had arrested them at the same time, without any understanding with Baker, and upon mere suspicion. There was no circumstance of restraint upon them up to the time of their arrest. Suppose the police had not arrested them at the time, but had continued to watch them without their knowledge, with the power to arrest them at any time until they had filled up and passed the bills, would it be contended that they were not guilty of forgery or counterfeiting because they had all the time been supervised and controlled by the police?

To constitute the crime, the law only requires the guilty possession. It is not necessary that the intent to fill them up should be proven by an attempt to do so. The person in possession may be unable to do so. He may intend to do it, or to cause it to be done, at some future time, when opportunity, convenience, and safety may serve him. His intention may be sufficiently manifested by the circumstances of his possession alone.

The instruction asked—to the effect that to find the defendant guilty they must find that he had the intent to fill up the blank or cause it to be done, and to pass or cause it to be passed; that both intents must concur—was correct as a definition of the offense, and was substantially given by the Court. Like the fifth instruction, however, asked for, it ignored the

proposition that, although Ah Sam was a mere messenger, he was properly convicted if he knew the purposes for which the blanks were designed.

The judgment and order are affirmed.

Mr. Chief Justice RHODES did not express an opinion.