[No. 20509. In Bank. — September 2, 1889.]

THE PEOPLE, RESPONDENT, *v.* J. B. McDONNELL, APPELLANT.

CRIMINAL LAW — COUNTERFEITING — FOREIGN BANK NOTES. — The counterfeiting of notes of the Bank of England is punishable under section 480 of the Penal Code of this state. The words "bank notes and bills" in that section include all bank notes and bills, both foreign and domestic, whether current in this state or otherwise.

ID. — INFORMATION — INCORPORATION OF FOREIGN BANK. — In an information for counterfeiting notes of the Bank of England, it is not necessary to allege the incorporation of the Bank of England, the fact of its incorporation being not an element of the crime. The description is satisfied as matter of identity by proof that the company is known as a corporate company and is acting as such, and as such issues bank notes or bills which come within the statute.

ID. — JURISDICTION OF STATE AND FEDERAL COURTS — POLICE POWER OF STATE. — The fact that the counterfeiting of notes of a foreign government is made an offense by act of Congress, of which the federal courts have jurisdiction, does not prevent a state from punishing the same offense when committed within its limits, or oust the state courts of jurisdiction of the offense against the authority of the state. The police power of the states belongs to them by virtue of their general sovereignty, and has never been ceded to the United States.

ID. — INSTRUCTION — POSSESSION OF COUNTERFEITING IMPLEMENTS. — An instruction as to what constitutes guilty possession of counterfeiting implements, given in the language of this court in the case of *People* v. *Ah Sam*, 41 Cal. 645, held correct, and properly applicable to the facts of this case.

APPEAL from a judgment of the Superior Court of the city and county of San Francisco, and from orders denying a motion in arrest of judgment and a motion for new trial.

The facts are stated in the opinion.

*C. B. Darwin*, *Crittenden Thornton*, and *F. H. Merzbach*, for Appellant.

*Attorney-General Johnson*, and *Davis Louderback*, for Respondent.

FOOTE, C.—The defendant was charged by information, under section 480 of the Penal Code, with having

knowingly, willfully, unlawfully, and feloniously in his possession a certain stamp, block, and plate made use of in counterfeiting bank notes, designed and engraved for the purpose of striking and printing counterfeiting bank notes, in the likeness of and similitude of the genuine five-pound notes of the Bank of England. Such possession being had by him for the purpose of knowingly and feloniously counterfeiting such bank notes.

His demurrer to the information on various grounds was overruled. He then pleaded not guilty, was tried, and convicted as charged. A motion for a new trial was made and refused, as also a motion in arrest of judgment. From the two orders made upon the motions mentioned, and the judgment of conviction, the defendant has appealed.

The jurisdiction of the trial court is assailed, on the ground that the information did not present any offense against the laws of this state, in that the note set out, and which the plate was said to be intended to print, was not sufficiently averred to be a bank note; that if it was a bank note, it was a foreign one, and not within the bank note protected by the Penal Code of this state, in section 480 thereof.

That if the note set out in the information, to quote the language of his brief, " did fall within the bank notes named in our state code, yet the state had no jurisdiction herein, because the Congress of the nation, by virtue of its international power, and in discharge of its international duty, had enacted a law for the protection of the very same bank note, and denounced the very same plate in the same terms and with the same intent, and had therein submitted the jurisdiction to its own tribunals, and had made no reservation in favor of state courts; that therefore, under the laws regulating judicial cognizance, the state court had no jurisdiction of the offense, even though she had denounced the same transaction in her code."

Section 480 of the Penal Code, under discussion, is as follows: " Every person who makes, or knowingly has in his possession, any die, plate, or any apparatus, paper, metal, machine, or other thing whatever, made use of in counterfeiting coin current in this state, or in counterfeiting gold-dust, gold or silver bars, bullion, lumps, pieces, or nuggets, or in counterfeiting bank notes or bills, is punishable by imprisonment in the state prison not less than one nor more than fourteen years; and all such dies, plates, apparatus, paper, metal, or machine, intended for the purpose aforesaid, must be destroyed."

The suggestion is made that the legislature, when it used the words "bank notes or bills," did not mean to include any foreign bank notes or bills. And in support of this, it is ingeniously and strenuously argued that such intention could not have existed on the part of the law-making body, or else it would have used more apt and certain language upon the subject, such as had been formerly employed in prior laws, and in the New York code, upon which our Penal Code is modeled.

However plausible the argument may be, we cannot suppose that the legislature intended by the comprehensive words " bank notes and bills " to mean less than all bank notes and bills, both foreign and domestic, current in this state, or otherwise. To say to the contrary would be to declare without proper foundation that the legislative assembly of our state had deliberately made California an asylum for all those evil-disposed persons who might desire to injure the currency of foreign nations, or to defraud our own citizens by passing off, upon, or selling to them counterfeit bills of such nations. Without some more direct and positive declaration of legislative intent to that end than has been shown in the argument of appellant, we should be very much averse to the belief which he so much desires us to entertain in his behalf.

Nor was it necessary that the information should have

alleged the incorporation of the Bank of England.    The fact of incorporation was not an element of the crime. (*People* v. *Ah Sam*, 41 Cal. 652; *People* v. *Henry*, 77 Cal. 445; Pen. Code, sec. 959, subd. 6, and sec. 960.)

"So, too, as a matter of identity, we think the description is satisfied by proof that the company is known as a corporate company, and is acting as such, and as such issues bills which come within the statute." (*People* v. *Ah Sam*, 41 Cal. 652.)

A painstaking and lengthy argument is made that the federal courts have exclusive jurisdiction of this crime, since the enactment of section 711 of the Revised Statutes of the United States, which reads as follows: "The jurisdiction vested in the courts of the United States in the cases and proceedings hereinafter mentioned shall be exclusive of the courts of the several states,—

"1. Of all crimes and offenses cognizable under the authority of the United States."

That provision of law was in existence when the supreme court of the United States, through Mr. Chief Justice Waite, delivered its opinion in the case of *United States* v. *Arjona,* 120 U. S. 479–488.   This was a case where the defendant had been indicted for the violation of sections 3 and 6 of the act of Congress of May 16, 1884, chapter 52, 26 Statutes, 22, "To prevent and punish the counterfeiting within the United States of notes, bonds, and other securities of foreign governments."    The statute, among others, makes the following things criminal:—

"SEC. 6.    Having in possession any plate, or any part thereof, from which has been printed, or may be printed, any counterfeit note, bond, obligation, or other security, in whole or in part, of any foreign government, bank, or corporation, except by lawful authority," etc.

After holding that the law in question was constitutional, and that the offense is one which the United States government may denounce, in the performance of a duty toward other nations, that tribunal observed:—

"A right secured by the law of nations to a nation or its people is one the United States as the representative of this nation are bound to protect. Consequently, a law which is necessary and proper to afford this protection is one that Congress may enact, because it is one that is needed to carry into execution a power conferred by the constitution on the government of the United States exclusively. There is no authority in the United States to require the passage and enforcement of such law by the states. Therefore the United States must have the power to pass it and enforce it themselves, or be unable to perform a duty which they may owe to another nation, and which the law of nations has imposed on them as part of their international obligations. This, however, does not prevent a state from providing for the punishment of the same thing; for here, as in the case of counterfeiting the coin of the United States, the act may be an offense against the authority of a state as well as that of the United States."

Although the point did not arise, and was not made in that case, that the federal jurisdiction was supreme and exclusive, and a state could not provide for the punishment of the same thing as did the United States, yet the language of that court is directly decisive of and against the objection made here, and we should respect it as the opinion of the tribunal of last resort as to such matters, which must be the final and supreme arbiter as to the jurisdiction of federal courts.

The language of the chief justice was evidently used for a purpose, to the end that a principle relative to the police powers of a state which had been settled by the supreme court of the United States, over which he then most ably presided, in prior adjudications should be still more firmly established; that is, that for violation of the federal laws the federal courts alone have jurisdiction. But that such acts, although denounced by federal laws, and punishable under such laws in federal courts

LXXX. CAL.—19

alone, may nevertheless be punished by state laws in state courts, where the punishment of such acts pertain to the police power of a state; that for such an act as here alleged to have been committed, the federal law may punish, for the protection of foreign nations and their people, and the state law for the act as one which may result in a fraud upon its citizens by passing upon them counterfeit bills of a foreign bank or corporation.

In *Priggs* v. *Pennsylvania*, 16 Pet. 625, in asserting the exclusive power of Congress over the subject of fugitive slaves, Justice Story observes: "To guard, however, against any possible misconstruction of our views, it is proper to state that we are by no means to be understood in any manner whatsoever to doubt or to interfere with the police power belonging to the states in virtue of their general sovereignty. That police power extends over all subjects within the territorial limits of the states, and has never been conceded to the United States."

In *Eells* v. *People*, 4 Scam. 512, Eells had been indicted under a statute of Illinois making it an offense to harbor and secrete a negro slave. The court said, by Mr. Justice Shields: "This [the state law] prescribes a rule of conduct for our own citizens. If the state can do this, and I hardly think the power questionable, it can punish those who violate the rule. If a state has power to regulate its own affairs, it has the power to define offenses and punish offenders.

"It is also said that this law may punish a man twice for the same offense. There is no force whatsoever in this objection. The offenses are separate and distinct; violations of distinct and different laws; and the punishment inflicted by different sovereignties. (*Eells* v. *People*, 4 Scam. 512.)

This case was afterward affirmed in *Moore* v. *People*, 14 How. 19, by the supreme court of the United States, where it was said:—

"But admitting that the plaintiff in error may be

liable to an action under the act of Congress for the same acts of harboring and preventing the owner from retaking his slave, it does not follow that he would be twice punished for the same offense. . . . . The same act may be an offense or transgression of the laws of both" (state and United States), for which, as afterward said, the offender may be justly punishable.  It was there, in addition, said: "The power to make municipal regulations for the restraint and punishment of crime, for the preservation of the health and morals of her citizens, and of the public peace, has never been surrendered by the states or restrained by the constitution of the United States." (*Moore* v. *People*, 14 How. 18.)

In the case of *United States* v. *Marigold*, 9 How. 569, Mr. Justice Daniel, speaking for the court, says: "This court, in the case of *Fox* v. *Ohio*, 5 How. 432, have taken care to point out that the same act might, as to its character and tendencies and the consequences it involved, constitute an offense against both the state and the federal governments, and might draw to its commission the penalties denounced by either, as appropriate to its character in reference to each."

In the case of *United States* v. *Cruikshank*, 92 U. S. 542, Mr. Chief Justice Waite, in discussing the subject of citizenship of the state and of the United States, disposes of the question in a statement, as we think, clear to demonstration:—

"The people of the United States resident within any state are subject to two governments,—one state and the other national; but there need be no conflict between the two.  The powers which one possesses the other does not.  They are established for different purposes, and have separate jurisdictions.  Together they make one whole, and furnish the people of the United States with a complete government, ample for the protection of all their rights at home and abroad.  True, it may sometimes happen that a person is amenable to both jurisdic-

tions for one and the same act. Thus, if a marshal of the United States is unlawfully resisted while executing the process of the courts within a state, and the resistance is accompanied by an assault on the officer, the sovereignty of the United States is violated by the resistance, and that of the state by the breach of peace in the assault. So, too, if one passes counterfeited coin of the United States within a state, it may be an offense against the United States and the state: the United States, because it discredits the coin; and the state, because of the fraud upon him to whom it is passed. This does not, however, necessarily imply that the two governments possess powers in common, or bring them into conflict with each other. It is the natural consequence of a citizenship which owes allegiance to two sovereignties, and claims protection from both. The citizen cannot complain because he has voluntarily submitted himself to such a form of government. He owes allegiance to the two departments, so to speak, and within their respective spheres must pay the penalties which each exacts for disobedience to its laws. In return, he can demand protection from each within its own jurisdiction."

The defendant here is not sought to be punished under any federal statute *as such*. He has been tried and convicted in a state court, under a state law having for its object the prevention of the passing to her citizens fraudulently, and to their damage, of counterfeit bank notes of a foreign bank.

The state is not inhibited from passing laws to punish an act which may result in fraudulent imposition upon its citizens, because the federal government has the exclusive right to punish for an infraction of its laws made in consequence of a duty it owes under the law of nations. The act is the same for which the person is punished, but the laws are different and for a different purpose. The state could not punish for an infraction

of the federal statute, but can do so as to its own statutes, when the object is to exercise the police power which appertains to it under the constitution of the United States. This is not an attempted nullification of a federal statute, or an effort to enforce it in a state court; it is a law to prevent frauds upon the citizens of the state, and has nothing to do with the purpose or enforcement of the federal law.

It is also pressed upon our consideration that the charge of the court in reference to what constituted possession of the plate or block, in order to bring the defendant's act within the denunciation of the statute, was erroneous.

It is claimed that the decision of the appellate court in the case of Ah Sam, *supra*, which was given to the jury by the court as part of its charge upon the question of possession, was not applicable to the case in hand; that it went only to the point of declaring that *an intention to use* such a block was enough without a *potential intention*, and that it was not a decision on the meaning of the word "possession" as used in section 480 of the Penal Code.

There is no clearer or better way that occurs to us by which this argument may be successfully refuted than to quote here the language of Justice Temple in that case, in 41 Cal. 654, in which the facts relating to the guilty possession were in all essential features similar to those in the case at bar (all italicized words being our own).

"There is but one other question in this case which we think it worth while to notice. That arises upon this state of facts, as appears from the bill of exceptions: The blanks, the possession of which is charged in the indictment, were printed by one Baker, who, before printing them, revealed the matter to the city police, and had an arrangement with them by which the police should be in ambush ready to seize the defendants and

the blanks immediately after they had been handed to them by Baker. Baker had from the police assurance that the blanks would be paid for, and without such assurances he would not have printed them. The ambush was laid according to the arrangement, and upon a signal being given by Baker, according to an understanding between him and the police, the latter appeared and seized Ah Sam and Ah Tuck, and took from them the impressions soon after they had come into their hands.

"*It is claimed that the defendants never had such a possession of the blanks as is contemplated by the statute;* that they were printed for the police, under a contract with them, and were really delivered to them according to contract, and were the property of the police; that the mere handing of them to the defendants, to be immediately taken away by the real owners, was no more than laying them upon a counter for them to take. They were given to the defendants at the request of the police, and remained, during all the time they were in defendants' hands, completely under the control of the police; *that the defendants did not have them as their property,* and during the time they held them, could not have intended to pass them; *that they must have had the ability to commit the offense,* as well as the intention, *and that ability they never had any more than they would have when immured in a dungeon;* that the intention meant by the statute is potential, and not a mere desire which there are no means to effectuate, and which does not and cannot result in any act; that *Baker and the police never parted with the possession of the blanks, but determined not to do so, and all the time supervised the handling of them by the defendants.*

"The police laws cannot be tested by any such metaphysical niceties as these. The problem proposed is similar, if not the same, as that which baffled the best intellects of the world of all ages in attempting to reconcile the fore-knowledge and providence of divinity with

the freedom and the moral responsibility of man. The law adopts the theory of responsibility of man, notwithstanding the controlling supervision of Providence.

"The defendants were not under duress nor compelled by the police, *prior to the arrest, to do anything whatever.* They contracted with Baker for the blanks as freely and as completely as though the authorities had not permitted him to do so. They had absolute control of their own actions when *they received the blanks,* and up to the very time they were arrested. The knowledge or intention of the police did not interfere with their freedom prior to that time. They had *the ability to commit the crime as fully as they would have had if the police had arrested them at the same time,* without any understanding with Baker, and upon mere suspicion. . . . .

"To constitute the crime, the law only requires the guilty possession. . . . .

"Although Ah Sam was a mere *messenger,* he was properly convicted if he knew the purposes for which the blanks were designed."

We conclude that the possession of the defendant, under the facts of this case, was a *guilty possession,* and the instructions of the court were in accordance with law.

Perceiving no prejudicial error in the record, we advise that the judgment and orders be affirmed.

VANCLIEF, C., and BELCHER, C. C., concurred.

The COURT. — For the reasons given in the foregoing opinion, the judgment and orders are affirmed.