[Crim. No. 2733. Second Appellate District, Division Two.—July 17, 1935.]

THE PEOPLE, Respondent, v. CARL VON BADENTHAL, Appellant.

Gold & Needleman for Appellant.

U. S. Webb, Attorney-General, Frank Richards, Deputy Attorney-General, Buron Fitts, District Attorney, and Jere J. Sullivan and S. Ernest Roll, Deputies District Attorney, for Respondent.

FRICKE, J., *pro tem.*—Appellant was convicted of obtaining the sum of $1200 by grand theft from John H. Schleifer. In April, 1934, the complainant was introduced by a mutual acquaintance to appellant as "Baron Von Badenthal" of Austria, the fatherland of complainant. Appellant stated to Schleifer that his family owned a large estate in Austria;

that his mother had died leaving fifteen million crowns in which he had a one-third interest; that he owned a 107-carat diamond which was in a bank vault in Paris and also owned a valuable oil painting in Syria; that he was in this country on business and was attempting to sell a scenario, which he had written, to a motion picture studio in Los Angeles; that his allowance from the estate was $300 a month, but that he had overdrawn to the extent of a thousand dollars and would not get any further allowance until August, and that his then present finances consisted of only twenty cents. Similar representations were made in subsequent conversations, in which, also, appellant displayed or claimed an acquaintanceship with various persons in Austria known to Schleifer. Sympathizing with the "Baron", the complainant took him to live with him in his home, where for a number of months appellant enjoyed the hospitality of complainant even to the extent of using his automobile and borrowing over six hundred dollars from his host.

About the middle of May appellant informed complainant that he had sold his motion picture scenario and that the contract had been signed, but that before he could receive the $15,000 purchase price it was necessary for him to secure a verification from the Vienna Playhouse that he had not sold them the screen rights to the picture. Later appellant stated to Schleifer that the best thing would be for him to go in person to Vienna, and requested complainant to advance him the necessary finances for the trip. In compliance with the request complainant, relying upon his representations and statements, loaned appellant $1200 for that purpose. On July 4th the "Baron" left Los Angeles on the ostensible trip to Europe. After arriving in New York he requested and received further financial advances from the complainant. While in New York appellant wrote a letter, dating it as having been written in Vienna, sent it to a friend in that city and had her mail it to complainant, and also, using the stationery of a transatlantic steamship, wrote a letter to Schleifer saying that he was on the boat. In fact, the "Baron" never left the United States, and when, some time later, complainant discovered this he had appellant arrested and returned to this jurisdiction.

After his arrival in Los Angeles appellant, in the city jail, admitted to complainant that he had lied to him, that his

true name was Karl Wellinger and that he was not a baron, and that he had not sold his scenario. On the witness stand, also, appellant admitted that he was not a baron, that he had not sold the scenario and had not gone to Europe. Witnesses from the motion picture studio established that appellant had not sold the scenario, and complainant's testimony as to the representations of appellant concerning his wealth, nobility and the selling of the scenario was corroborated by the testimony of Mrs. Schleifer. Other witnesses testified that appellant had stated to them that he had sold the scenario.

While denied in many respects by appellant, there is ample evidence of the facts herein recited. ■ The evidence is sufficient to sustain the conviction. The money was obtained by the false pretense that the scenario had been sold, and the judgment could also be sustained on the theory of larceny by trick and device, the money having been advanced to be used for the particular purpose of the European trip which appel-lant never intended to take, and the money was used by appellant, in accordance with his intent at the time he received it, for other purposes. Appellant himself admitted that he never intended to use the money to go to Europe. The fact that the money was turned over as a loan does not affect this rule. (*People* v. *Rae,* 66 Cal. 423 [6 Pac. 1, 56 Am. Rep. 102]; *In re Clark,* 34 Cal. App. 440 [167 Pac. 1143].)

Appellant claims error because the trial court failed to discharge the jury and declare a mistrial when the jury declared its inability to agree, and because an alternate juror was substituted for one of the original twelve jurors after the jury had been deliberating for some time without arriving at a verdict.

■ After being instructed the jury, having heard some seven or eight days of testimony, retired to deliberate at 2 :40 P. M. on March 19, 1935. At 3 :50 P. M. on March 20th the jury was brought into court and, being asked by the judge, the foreman stated that the jury had not agreed upon a verdict, that numerically they stood 10 to 2 and that up to fifteen minutes prior thereto the votes, since their first ballot, had been 9 to 3. On further inquiry the foreman expressed the opinion that an agreement was practically impossible. Further questioned, the foreman said that the jury was disagreed

as to both the law and the facts, and that it would help the jury if they were given a further interpretation of the subject of intent, and one of the jurors expressed a belief that "by clarifying the intent a little more" the jury might be able to agree. The record shows that when the court asked the jury whether further deliberation would be productive of an agreement, "voices in unison", the number not being disclosed, answered, "I don't think so." The trial judge then commented upon the fact that the jury had not requested to be discharged and stated that he would discuss the question of intent and the law applicable, to which the foreman responded that the question was "responsibility instead of intent". Counsel for both sides stipulated that the court might instruct the jury orally. The court then properly instructed the jury on the law applicable to the subject of intent and also commented on the doctrine of reasonable doubt and the presumption of innocence.

At 4:52 P. M. of the same day the jury again returned into court, apparently to have some testimony read, and were informed by the judge that the shorthand reporter was not then available, that the jurors would have to rely upon their memory of the testimony concerning which they had made inquiry and requested that they deliberate further. The foreman then volunteered the information that the jury still stood 10 to 2, that two of the jurors' minds were closed and that one of them had authorized him to state that her mind was made up and closed to further discussion but that she did not refuse to further discuss the evidence or the law. The court then directly inquired of the jurors whether any one of them was unwilling or refused further to discuss the evidence. To this there was no response. The court again requested that if any juror would not further discuss the evidence or would not change his opinion regardless of what argument might ensue, such juror should advise the court, and if any juror had that idea the court would not want to impose further confinement upon the other jurors. No juror responded to this. The foreman, however, made a statement that one of the jurors had said her mind was made up, and the subject was closed. The judge then stated he would ask the jury to retire for a short while at least, and directed the bailiff to take the jury to supper and that they resume their deliberations the following day.

We find nothing in the matters related above which warrants any conclusion other than that the court, not satisfied that a verdict could not be agreed upon, requested the jury to further discuss the evidence and endeavor to arrive at a verdict. In this there was no impropriety. (See *People* v. *Baker*, 94 Cal. App. 687, 690 [271 Pac. 777], and cases cited.)

■ There was no error in the fact that the court by inquiry ascertained how the jurors were numerically divided. (See discussion in *People* v. *Talkington*, *ante*, p. 75 [47 Pac. (2d) 368].) Such information by itself is proper as a means of assisting the court in its determination as to whether there is a reasonable probability of the jury agreeing upon a verdict and the advisability of sending them out for further deliberation. An examination of the California cases seeming to hold otherwise (see *People* v. *Talkington*, *supra*, and cases there considered) discloses that the errors there involved lay in the fact that the inquiry as to how the jury stood was coupled with statements by the trial court which were themselves prejudicial error.

■ While appellant had been on the witness stand one of the jurors, Rhoda Gould, obtained permission to ask him a question, and, that being answered, obtained permission to ask another; but, instead of asking the question, put her hands to her face and burst into hysterical crying, whereupon the court took a recess and the juror was attended by one of the other lady jurors. On the evening of March 20th the juror, Rhoda Gould, became ill at the dinner table and it required two persons to assist her to the elevator, at which point she was obliged to sit down and then fainted. The hotel house physician was called and attended her. After the jury had returned to the juryroom the following morning the judge caused them to be brought into court, and in the presence of appellant and counsel stated that the illness of one of the jurors had been reported to him and that the doctor who had attended her was present. Placed upon the witness stand, the physician testified that he had found the juror suffering from a heart attack induced by acute indigestion, and very highly nervous and hysterical. The physician further testified that in his opinion it would be in the best interests of the juror not to continue on the jury; that undue excitement and discussion might prove injurious to her; that her illness was such that she ought not to and was unable to

perform the duty of a juror and that the condition of her heart was serious and might prove fatal. The court thereupon declared its finding that the juror was unable to perform her duty by reason of illness, ordered that she be discharged and that the alternate juror duly chosen and sworn at the beginning of the trial should take her place as a member of the jury. The jury then retired for further deliberation. This procedure was authorized by section 1089 of the Penal Code, which provides that "If at any time, whether before or after the final submission of the case to the jury, a juror die or become ill, so as to be unable to perform his duty . . . , the court may order him to be discharged and draw the name of an alternate, who shall then take his place in the jury box and be subject to the same rules and regulations as though he had been selected as one of the original jurors."

Appellant claims it was error for the court to deny defendant's counsel's motion to have another doctor brought in to examine the juror before she was discharged. No such motion was made. Counsel did, during the course of the medical testimony, state, "I would like to have another doctor called in this case," but that statement was not a motion. A motion is an application made to the court for an order (*People* v. *Ah Sam*, 41 Cal. 645; Code Civ. Proc., sec. 1003); and the language used, especially when read with the context, was not such as would indicate that an order was desired, and hence no ruling was made. There was no error here.

Appellant also asserts that "Miss Gould then desired to make a statement and also ask a question in open court and was refused to do this by the court." Counsel has ignored the record, which shows merely that during the course of the examination of the physician the juror interrupted with the single remark, "May I ask a question?" to which the court replied, "No, I think not, Miss Gould." Nothing further on this subject appears in the record. We have no means of knowing what the question was, and no further effort was made by the juror or counsel to pursue the matter further. The trial judge was most courteous during the entire proceeding and no reason appears why the juror could not have made a statement prior to her discharge had she so desired. Appellant was then as familiar with the incident as now, and had he desired he could have called the juror and another physician as witnesses, and, we assume, would have done so

had the circumstance then indicated that there was any occasion for such testimony. Before an appellate court will consider suggested error it must appear that counsel exercised due diligence to avoid and correct error in the trial court. Appellant suggests that the juror during the proceedings last above referred to was "evidently in good health and able to continue", but quite significantly omits in this connection any reference to the record, because, perhaps, the record fails to support such statement.

The evidence of the bailiff and other jurors as to the seizure by the juror with illness and her condition at the hotel, and the testimony of the hotel house physician, presented to the trial court a condition clearly calling for the discharge of the juror and the substitution of the alternate, and the court's action was eminently proper.

On the afternoon of the same day appellant's counsel requested the court to vacate its order discharging the juror who had been ill and to reinstate her as a member of the jury. While the denial of this motion is assigned as error, appellant offers no authority which would warrant the court in granting such a motion. The motion seems to have been based on the theory that the juror was able to resume her duties, but no proof of that fact was offered. Furthermore, the then existing jury, with the alternate included, was the lawful jury deliberating upon the verdict, and the discharged juror had, since her discharge, left the courtroom and had undoubtedly come in contact and, as shown by the record, had conversations with other persons in which the cause on trial was mentioned if not discussed. The court properly denied the motion.

The matter of the substitution of an alternate juror was again raised on the motion for new trial, supported by affidavits of the juror and a physician who had examined her shortly after her discharge, to the effect that the juror at the time of her discharge was capable of continuing her duties as a juror. Even if we assume that these affidavits established that the discharged juror was physically and mentally capable of continuing as a member of the jury, this would not show that the court erred in its decision at the time the juror was discharged. The action of the court must be tested in the light of the evidence before it at the time of the decision. At that time the court was warranted in concluding that the

juror was too ill to proceed. The fact, if true, that after the substitution of the alternate juror had been ordered evidence was discovered contrary to that upon which the decision was based does not render the ruling erroneous. ▮ The affidavits on motion for a new trial were, however, contradicted by the evidence of the bailiff in charge of the jury and one of the jurors, and in this conflict of evidence the decision of the trial court on motion for a new trial was final, especially since in certain respects the affidavits submitted by appellant contained statements which it would appear from the record were, to the knowledge of the trial judge, contrary to the facts. The motion for a new trial was properly denied.

▮ Appellant's contention that the substitution of the alternate juror placed him twice in jeopardy is without merit.

The judgment and order are affirmed.

Crail, J., concurred.

STEPHENS, P. J., Dissenting.—I dissent. I am not convinced that the substitution of an alternate juror for a regular juror after the jury has had the case under submission and has considered it sufficiently to have submitted the individual opinions of its members to a vote upon the question of guilt is a trial by one jury within the meaning of the term, historically speaking, or as it is used in our Constitution.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on August 15, 1935.