Filed 11/17/17

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Siskiyou)

----

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>SHAWN DARYL YOUNG,<br><br>　　　　Defendant and Appellant. | C077483<br><br>(Super. Ct. No. 131379) |

APPEAL from a judgment of the Superior Court of Siskiyou County, Laura Masunaga, Judge. Reversed.

Ann Hopkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Xavier Becerra, Attorneys General, Gerald A. Engler, Michael P. Farrell, Assistant Attorneys General, Daniel B. Bernstein and Jennifer M. Poe, Deputy Attorneys General, for Plaintiff and Respondent.

---

\*　　Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II of the discussion.

1

Defendant Shawn Daryl Young was convicted by jury of sexually abusing his two daughters, A. and H., as well as their friend, M., who lived next door. With respect to A., defendant was convicted of sexual penetration with a child 10 years of age or younger (Pen. Code, § 288.7, subd. (b))[1] and lewd or lascivious conduct with a child under the age of 14 years (§ 288, subd. (a)). (Counts 1 & 2) With respect to H., defendant was convicted of sexual intercourse with a child 10 years of age or younger (§ 288.7, subd. (a)), sexual penetration with a child 10 years of age or younger (*id.*, subd. (b)), oral copulation with a child 10 years of age or younger (*ibid.*), and continuous sexual abuse of a child under the age of 14 years (§ 288.5, subd. (a)). (Counts 3-6) With respect to M., defendant was convicted of sexual penetration with a child 10 years of age or younger (§ 288.7, subd. (b)). (Count 7) The trial court sentenced defendant to serve an aggregate determinate prison term of 18 years (upper term of 16 years for Count 6 plus 2 years consecutive for Count 2), plus a consecutive indeterminate term of 85 years to life (25 years to life for Count 3, plus 15 years to life each for Counts 1, 4, 5, and 7).

On appeal, defendant contends: (1) we must reverse the judgment because the trial court lacked good cause to excuse one of the sitting jurors (Juror No. 4) and doing so in the absence of both defendant and his assigned trial counsel violated defendant's constitutional rights; (2) defendant's convictions for Counts 3 and 6 must also be reversed for insufficient evidence; (3) defendant's Count 6 conviction must be vacated because section 288.5, subdivision (c), mandates charges of continuous sexual abuse and specific sexual offenses, pertaining to the same victim over the same period of time, be charged in the alternative; (4) the trial court prejudicially erred and violated defendant's constitutional rights by allowing two prosecution witnesses to testify to their opinion that the complaining witnesses were credible; (5) defendant's trial counsel provided

---

[1]     Undesignated statutory references are to the Penal Code.

constitutionally deficient assistance by failing to object to certain assertions of prosecutorial misconduct; and (6) the trial court prejudicially erred by failing to instruct the jury on attempted sexual penetration as a lesser included offense to Count 7.

We conclude the trial court did not have good cause to excuse Juror No. 4. We also conclude doing so outside defendant's presence and while he was represented by an attorney who was standing in for defendant's temporarily ill trial counsel, and who was told she was appearing to agree to a continuance on defendant's behalf, violated defendant's federal constitutional rights. Because we cannot conclude this error was harmless beyond a reasonable doubt, we must reverse the judgment. This conclusion makes it unnecessary to address defendant's remaining claims except those challenging the sufficiency of the evidence. As to those, we conclude sufficient substantial evidence supports defendant's conviction in Count 3. Not so with respect to Count 6. We must therefore reverse the judgment on that count for insufficient evidence.

## FACTS

Defendant and his family, consisting of his wife and daughters A. and H., moved from Texas to Hornbrook, a rural community not far from the Oregon border, sometime in May 2013. They initially stayed in a small house with defendant's father and stepmother. In July or August, the family moved into a house located on a piece of property managed by a friend of defendant's wife. This friend also lived on the property, in a separate house, with her husband and their four children, including their five-year-old daughter M. A. and H. were four years old and three years old, respectively.

### *Sexual Abuse of A. and H.*

Defendant's sexual abuse of his daughters came to light during the third weekend of August 2013. At some point that weekend, M.'s mother discovered from talking to her daughter that A. had tried to put her finger in M.'s vagina while the two were picking blackberries together. On two prior occasions, A. had tried to hold M. down and kiss her.

3

Concerned A. was acting out sexually, M.'s mother spoke to defendant's wife about the latest incident and obtained her permission to ask A. about it.

M.'s mother then had a private conversation with A. while they played with M.'s hamster. When asked about the incident, A. "got a shy look on her face," but then admitted to trying to put her finger in M.'s vagina. M.'s mother told A. several times that she was not in trouble and asked how she knew something could go into a vagina, using the word "pee-pee" for vagina because that was the word the children used for it. A. responded, "Daddy taught me" and added: "This is how we show we love each other." As M.'s mother explained her reaction: "I tried really hard to keep a straight face for that little baby. Everything in me as a mom wanted to just explode and freak out." Instead, she calmly asked for more details. A. said it was "not okay to tell because [defendant] might kill Mommy." After multiple assurances that "it was okay to tell the truth," A. revealed defendant played "games" with her while her mom was at work, including defendant touching and putting things into her vagina and making her touch and kiss his penis. In the conversation, A. used the word "pee-pee" for both vagina and penis. A. also said defendant did these things to her when they lived in Texas and continued to do so in California, both at her grandfather's house and at their new house.

After speaking to A., M.'s mother spoke to H. to find out whether defendant was also abusing her. After telling H. it was okay to tell the truth, M.'s mother said A. had told her "about the games that [they] play with Daddy," without saying what these games were. H. initially avoided eye contact and remained quiet, but eventually said they played "pee-pee kissing games" because "that's what Daddy likes to do when [M]ommy is not home." H. also confirmed defendant did these things when they lived in Texas and at their new house in California.

M.'s mother reported these disclosures to defendant's wife, who "flipped out," going from "sobbing and crying" to "screaming angry." At some point, defendant's wife

4

took A. outside and asked about what she had told M.'s mother. A. told her mother she touched M.'s vagina because she loved her friend and, as she put it, "that's how Daddy showed us love." When asked how defendant showed her love, A. said he "would touch [her] pee-pee and [they] would play pee-pee kissing games," elaborating: "I would kiss H.'s pee-pee, and Daddy would kiss mine." A. also told her mother defendant "would stick carrots inside of [their] pee-pees." Defendant's wife then had a private conversation with H. about what she had told M.'s mother. When she asked H. what the "pee-pee kissing game" meant, H. said: "Daddy . . . would kiss my pee-pee and put carrots inside." She also said he put his "pee-pee" on her face and it hurt when he put his fingers and carrots inside of her "butt." Both A. and H. said they did not tell her about the abuse because defendant threatened to shoot her if they told.

M.'s mother and defendant's wife decided to call the Siskiyou County Sheriff's Department and Child Protective Services (CPS) to report the abuse. M.'s mother made the call because defendant's wife "was physically ill at that point." Defendant moved out after his wife confronted him with the allegations.

A social worker from CPS, Angeline Brophy, came out to the house to interview A. and H. the following week. The purpose of these initial interviews was not to document the abuse in detail, but to determine whether or not to refer the matter to law enforcement authorities. Brophy spoke with A. first. After establishing A. knew the difference between the truth and a lie through introductory questions, Brophy asked her who lived at the house. When A. got to defendant, she added: "But he is naughty." Brophy asked what she meant. A. responded, "My dad is naughty because he puts sticks and stuff in my pee-pee," pointing to her vagina. Brophy asked when the last time something like that happened. A. said defendant put a carrot in her vagina at their house in Hornbrook, he told her not to tell anyone, and she was afraid of him. Brophy also asked about the incident with M., but A. denied touching her vagina. She also denied

defendant ever asked her to touch him. Brophy ended the interview without getting additional details because A. seemed nervous and Brophy already had enough information to refer the matter to law enforcement.

Brophy then interviewed H. After establishing she knew the difference between the truth and a lie, Brophy also asked her who lived at the house. When H. got to defendant, she said: "My dad touches my pee-pee with his fingers." She also pointed to her vagina to indicate that is what she meant by "pee-pee." After establishing H. knew the difference between inside and outside, Brophy asked whether defendant put his fingers inside her vagina. H. said he did. She also revealed that he put a carrot inside her vagina. When asked how many times he did that, H. responded: "A lot. More than five times." She said the last time defendant put his fingers in her vagina was at the recreational pool in Hornbrook. Defendant told her not to tell anyone about the carrots. Finally, H. said defendant put his penis on her eye, but denied he put his mouth on her vagina or had her put her mouth on his penis. Again, because Brophy had enough information to refer the matter to law enforcement, she ended the interview without getting additional details.

Brophy referred the matter to law enforcement the first week of September. The following week, Detective Jacques Morlet went out to the house to conduct follow-up interviews with A. and H. The detective spoke to A. first. When he asked her if she knew why he wanted to talk to her, A. said: "Because Daddy's a bad, bad man." After establishing A. knew the difference between the truth and a lie, much like Brophy had done, the detective asked whether defendant did anything to her that he told her not to tell anyone. A. responded: "He, um, messed with me." When the detective asked how defendant messed with her, A. said he made her eat an apple when she did not want to and also made her touch a flower. The detective then established A. knew what her "private parts" were and "the difference between a good touch and a bad touch" and

6

asked whether she remembered telling Brophy about defendant doing something that was "kinda like a bad touch." A. said defendant made her dinner, but she "didn't eat it all." The detective then told A. it was okay to be embarrassed, but he wanted her to tell him the truth about what she told Brophy. A. responded: "He um, he, he sticked carrots in my pee-pee." She said this happened "a long time ago" when they lived in Texas. A. also said this happened only one time and defendant told her not to tell anyone. After speaking to A., the detective tried to interview H., but she did not want to answer his questions, which he said was "perfectly fine."

About two weeks later, Brophy conducted a forensic interview with H. During the interview, H. said her father was "mean" because he "put carrots . . . and all that stuff in [her] pee-pee" at the house in Hornbrook. When Brophy asked what else defendant put inside her vagina, H. pointed to various stuffed animals and other items in the interview room and said: "He put that. Not that. That and that and that and that. He put all the stuff in my pee-pee." She then directed Brophy: "So write it." When Brophy asked whether she had seen defendant's "pee-pee," H. said: "He put it together to my pee-pee." Brophy then established H. knew the difference between inside and outside and asked: "Did your daddy put his pee-pee inside your pee-pee or outside your pee-pee?" H. answered: "Inside my pee-pee." Brophy asked what happened then, to which H. responded: "He put the teddy bear in my pee-pee too." She again directed: "Write that." Brophy asked whether defendant ever put his mouth on her vagina. H. answered: "Yes. And inside his pee-pee and inside my pee-pee." Brophy also asked whether defendant ever had her touch his penis. H. answered: "He want me to touch, he touched my pee-pee and I touched his pee-pee." When Brophy asked what defendant's penis looked like, H. said it looked like a "cracker" and pointed to a Nutter Butter cookie that was on a table in the interview room. Brophy asked how many times defendant touched H.'s vagina. She responded: "Um, five times, like three times." When Brophy asked whether A. was

7

involved in any of these incidents, H. answered: "Yes. He took [A.'s] pee-pee and my pee-pee and my mom's pee-pee. And his pee-pee." Brophy responded: "Your mom was there when he touched your pee-pee?" H. answered, "Yes. She said it," and, "She said, 'Don't do that again.' And [defendant] didn't listen to my mom," so "she just killed him." Brophy asked: "Where's your dad right now?" H. answered: "He's in jail."

At this point in the interview, Brophy brought out some anatomical drawings of a girl and a man and had H. identify the various parts and point out where defendant touched her and where she touched him. Brophy then asked whether anything happened at the pool. H. said defendant "put his pee-pee on the ground and he touched [her] pee-pee" during a pool party. Brophy asked: "How did your daddy get his pee-pee into your pee-pee in the pool?" H. answered: "Like he put inside his finger in my pee-pee like this." Brophy then asked: "Did he put his pee-pee in your pee-pee in the pool?" H. answered: "Yes." After stepping outside to talk to Detective Morlet, Brophy returned and had H. color on the drawings to represent the various places defendant touched her and had her touch him.

A. and H. testified at trial, although H. refused to answer any questions relating to the abuse, repeating, "I don't want to talk about it" and, "I don't want to say it" several times. She also stated there was someone in the courtroom she was afraid of, identifying that person as "a boy," but providing no further details. A. did provide testimony regarding the abuse. She testified defendant touched her on her "pee-pee" and her "butt," identifying her vagina and buttocks on anatomical drawings shown to her on the witness stand. She testified defendant touched her vagina with his hands and finger on one occasion at the house in Hornbrook and did so on other occasions when they lived in Texas. Defendant also touched her buttocks twice at the house in Hornbrook. A. also testified defendant put carrots inside her vagina on two occasions at this same house.

8

### *Sexual Abuse of M.*

During the second week of September, two days after Detective Morlet interviewed A., M. revealed to her mother that defendant also put his finger inside her vagina on one occasion. M.'s mother testified: "She told me that [defendant] had -- the girls were over there playing at their rental on my property, and they were all running around in bathing suits, like every day, and that he was on his computer, and that she ran in that room to ask him something and that he put his finger underneath her bathing suit on her pee-pee, and that she got scared and tried to pull away and said, 'I want my Mommy.' And he said, 'You can't go tell your mommy, you can't tell anybody, you can't go over. You need to go play with the girls right now.' " When M.'s mother asked her daughter where defendant put his finger, M. put her finger "onto her pee-pee, right in her labia." M. did not say when this occurred. M.'s mother estimated it must have happened during the "middle to the third week" of August, based on when M. would have been over there playing with her friends.

M.'s mother reported the incident to Detective Morlet, who came out to her house with Brophy two days later to conduct an interview with M. Brophy tried to interview M. in private, but she refused, so the interview took place in the living room with M. sitting on the couch with her parents and Brophy sitting on the floor facing the child. During the interview, after establishing M. knew the difference between the truth and a lie, Brophy asked whether there was a time M. "got in trouble" while she was over at defendant's house playing with her friends. M. responded: "I did." When Brophy asked why she got in trouble, M. apparently looked up at her mother, prompting her mother to say: "I don't know why hunny. Just tell her what happened." M. then pointed to her vagina. Brophy asked what she called that part of the body. M. answered: "Our pee-pee." Brophy then asked what happened to her pee-pee. M. responded, "He did this," grabbing her vaginal area with one hand and lifting upwards. In response to

9

further questions, M. identified defendant as the "he" who did that to her and also said she was wearing a bathing suit at the time and defendant's finger went underneath the bathing suit and inside her vagina.

M. also testified at trial. She testified defendant touched her "pee-pee" and "butt" on the outside of her bathing suit. She claimed to not remember what he touched her with, but said it happened on one occasion while she was over at his house playing with A. and H. According to M.'s testimony, she immediately ran home and told her mother what defendant had done.

DISCUSSION

**I**

***Removal of Juror No. 4***

Defendant contends we must reverse the judgment because the trial court lacked good cause to excuse Juror No. 4 and doing so in the absence of both defendant and his assigned trial counsel violated defendant's constitutional rights. We agree.

**A.**

***Additional Background***

The prosecution's presentation of its case against defendant was set to begin on Monday, June 16, 2014, the jury (including the alternates) having previously been selected and sworn. The trial court went on the record at 8:30 a.m., prior to the arrival of the jury, to note neither defendant nor his defense counsel, Barton, was present. Barton was apparently ill and informally agreed with the prosecutor that the matter would be continued until the following day and therefore defendant need not be brought over to court. Explaining it was not up to the attorneys and custodial staff to decide whether the matter would be continued and whether defendant's presence would be necessary, the trial court ordered defendant brought over and also ordered the presence of someone from the Public Defender's Office to stand in for Barton.

10

Defendant and stand-in counsel, O'Connor, arrived a short time later. After some discussion between the trial court and the prosecutor about when Barton was expected to be well enough to return and other scheduling matters, the trial court stated it intended to excuse defendant because he was "in his jail garb." The trial court also explained the jury would be brought in at 9:00 a.m., informed there would be no proceedings that day because of unexpected circumstances, and ordered to return the following day. The trial court then asked O'Connor whether she agreed conversation with the jury could take place outside defendant's presence. O'Connor agreed. Defendant was then excused.

At 9:00 a.m., before the jury was brought into the courtroom, the trial court stated on the record that two of the jurors were not present and explained: "So I have directed my clerk to go ahead and contact them. There is some roadwork in some of the areas, and I know for a hearing that I had last week it was almost a 45-minute delay for people to get in, but I don't know if that's what's going on, but I'll have her contact them." At 9:15 a.m., the trial court went back on the record and stated one of the missing jurors, Juror No. 12, was admitted to the hospital the previous Friday and had major bypass surgery, so Juror No. 12 would be excused and replaced with an alternate. With respect to the other missing juror, the trial court stated: "I have also -- we have been trying to contact [Juror No. 4], . . . and I think at this point it's 9:15, Counsel. And I'm going to have my bailiff check one more time to see if [Juror No. 4] is present. But if that juror is not present, I think the best course of action would be to go ahead and excuse that juror, because that juror did not come in. We don't know why, we have not heard."

The jury was then brought into the courtroom. Juror No. 4 was still not present. As promised, the jury was informed there would be no proceedings that day because of "unexpected issues" and ordered to return the following day. The trial court then removed Jurors No. 12 and No. 4, replacing them with alternate Jurors No. 1 and No. 2,

respectively. After excusing the newly-constituted jury for the day, the trial court stated: "I'll direct my clerk to contact our jury commissioner to know that I have discharged [Juror No. 4], he could possibly be on his way. There is some roadwork going on, but unless they contact us we just don't know."

## B.

### *Forfeiture*

As a preliminary matter, the Attorney General asserts defendant's challenge to Juror No. 4's removal is forfeited by his failure to object below. Had defendant been present with his assigned counsel, Barton, when the removal occurred, this assertion would undoubtedly have merit. (See *People v. Wilson* (2008) 43 Cal.4th 1, 25 [failure to object to juror removal or move for mistrial forfeits claim of error on appeal].) However, as previously mentioned, neither defendant nor Barton was present to object to Juror No. 4's removal. There is no indication in the record that stand-in counsel, O'Connor, had any familiarity with defendant's case or with the selection of defendant's jury. Her presence the morning of the challenged removal was explicitly for purposes of representing defendant while the jury was informed the matter would be continued to the following day. As we explain later in this opinion, her presence when Juror No. 4 was removed was tantamount to having no representation at all. In these circumstances, we cannot hold her failure to object to the removal against defendant.

However, as the Attorney General also points out, Barton did not object to the removal when she returned the following day. Thus, we are faced with the more difficult question of whether or not this failure should operate to forfeit defendant's claim on appeal.

In *People v. Davidian* (1937) 20 Cal.App.2d 720 (*Davidian*), a juror was removed and an alternate substituted in her place. Defense counsel did not object at the time of the removal. The following day, counsel declined to stipulate that "the jury is present,"

12

noting he did not want to waive an appellate challenge to the trial court's decision to remove the juror. (*Id*. at pp. 725-726.) The Court of Appeal rejected this challenge, explaining: "We feel that this objection—if it can be so called or if it was well taken—which was made by [defense counsel], came too late and can avail [the defendant] nothing upon this appeal." (*Id*. at p. 727.) Similarly, in *People v. Von Badenthal* (1935) 8 Cal.App.2d 404 (*Von Badenthal*), a juror was removed and replaced by an alternate when she became too ill to continue deliberations. (*Id*. at pp. 410-411.) That afternoon, defense counsel asked the trial court to vacate its order removing the juror and to reinstate her as a member of the jury. The Court of Appeal concluded the motion was properly denied, noting the defendant "offer[ed] no authority which would warrant the [trial] court in granting such a motion." (*Id*. at p. 412.) The court further explained, "the then existing jury, with the alternate included, was the lawful jury deliberating upon the verdict, and the discharged juror had, since her discharge, left the courtroom and had undoubtedly come in contact and, as shown by the record, had conversations with other persons in which the cause on trial was mentioned if not discussed." (*Ibid*.)

Based on these authorities, Barton might well have concluded it was too late to object to the removal of Juror No. 4 after the removal had already taken place and the trial court would have had no basis upon which to grant such a motion. In short, there was reason for Barton to conclude an objection to the removal at that time would have been futile in the sense the erroneous removal of the juror could not have been remedied. (See *People v. Abbaszadeh* (2003) 106 Cal.App.4th 642, 648 [exception to forfeiture rule where objection would have been futile].) Moreover, even though Barton could have raised the issue in a motion for new trial, as the defendant did in *Von Badenthal*, nothing in that case suggests the failure to do so operates as a forfeiture of the issue on appeal. It is the failure to object *at the time of the removal* that forfeits the issue. (*Davidian*, *supra*,

at p. 727.)  But here, neither defendant nor Barton was present at the time of the removal. While we conclude this fact prevents that failure from constituting a forfeiture in this case, it would not have been entirely unreasonable for Barton to have believed the issue was forfeited for purposes of obtaining relief in a new trial motion, and filing such a motion on that basis would have been just as futile as objecting to the removal the day after it occurred.

In any event, the fact that a party may forfeit a right to present a claim of error to the appellate court if he or she did not raise the issue in the trial court does not mean the appellate court is deprived of authority to reach the merits of the issue.  "An appellate court is generally not prohibited from reaching a question that has not been preserved for review by a party.  [Citations.]  Indeed, it has the authority to do so.  [Citation.]  True, it is in fact barred when the issue involves the admission (Evid. Code, § 353) or exclusion (*id*., § 354) of evidence.  Such, of course, is not the case here.  Therefore, it is free to act in the matter.  [Citation.]  Whether or not it should do so is entrusted to its discretion."  (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6; see also *People v. Marchand* (2002) 98 Cal.App.4th 1056, 1061 [appellate court has discretion to adjudicate important question of constitutional law despite party's forfeiture of right to appellate review].)  Here, as we explain below, defendant's constitutional rights were violated by the trial court's removal of Juror No. 4 outside his presence and at a time he was effectively not represented by counsel.  We would exercise our discretion to address the merits even if we agreed with the Attorney General's forfeiture argument.

## C.

### *Section 1089*

Section 1089 provides in relevant part:  "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, *or upon other good cause shown* to the court is found to be unable to perform his or her duty, or if a juror

14

requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors." (Italics added.)

" 'Once a trial court is put on notice that good cause to discharge a juror may exist, it is the court's duty "to make whatever inquiry is reasonably necessary" to determine whether the juror should be discharged.' [Citation.] On appeal, the trial court's determination is reviewed for abuse of discretion. [Citations.]" (*People v. Leonard* (2007) 40 Cal.4th 1370, 1409.) However, "[w]hile the court's decision will be given great deference, its discretion is not unfettered." (*People v. Bell* (1998) 61 Cal.App.4th 282, 287 (*Bell*).) "The court must make a reasonable inquiry to determine whether the person in question is able to perform the duties of a juror. [Citation.] If the answer is in the negative, the inability to perform those duties must be shown on the record to be a 'demonstrable reality.' [Citation.]" (*Ibid*.)

Here, Juror No. 4 was removed for being absent about 15 minutes after he was scheduled to report for the start of the evidence portion of the trial. As the trial court acknowledged on the record, he might have been stuck in traffic due to roadwork in the area. Or, as the Attorney General posits, he might have been "shirking his duties and evading jury service." The record does not reveal which of these scenarios, if either, was the actual situation. As our Supreme Court has stated: "Unless the facts clearly establish a sufficient basis on which to reach an informed and intelligent decision, the court must conduct an appropriate hearing in the presence of litigants and counsel on the question of the juror's ability to serve." (*In re Mendes* (1979) 23 Cal.3d 847, 852 (*Mendes*), superseded by statute on another point, as stated in *People v. Cottle* (2006) 39 Cal.4th 246, 254, fn. 2.) The trial court did not conduct such a hearing. Instead, outside defendant's presence and while he was being represented by stand-in counsel, the trial

court removed Juror No. 4 based on an admitted lack of information regarding the reason he was 15 minutes late. We conclude this was an abuse of discretion. (See *People v. Delamora* (1996) 48 Cal.App.4th 1850, 1856 ["where, as here, there is no evidence at all to show good cause (because no inquiry of any kind was made), the procedure used was by definition inadequate"].)

Nevertheless, the Attorney General argues the trial court did make an inquiry into Juror No. 4's whereabouts and the lack of information in this regard "was not for lack of trying," pointing out the court clerk was apparently unable to reach the juror by phone and the bailiff checked the juror waiting area to see if he had arrived prior to his removal. However, under *Mendes*, *supra*, 23 Cal.3d 847, when this preliminary inquiry neither confirmed the juror was on his way nor clearly established he was unable to serve as a juror, the trial court was required to hold a hearing in the presence of defendant and counsel. This did not happen.

The Attorney General also cites *Bell*, *supra*, 61 Cal.App.4th at page 289, for the proposition that "one 'cannot reasonably expect the court system to be placed in "park" in the hope that an ostensibly favorable juror will return at some future time.' " *Bell* is inapposite. There, the removed juror called the clerk the morning of the second day of evidence and stated he needed to take his son to the hospital following an undisclosed emergency and he did not believe he could be back before 1:30 p.m. (*Id.* at p. 287.) After holding "a short conference, with [defendant] and both counsel present," during which argument from both sides was entertained, the trial court removed the juror "in the interest of judicial economy," noting, "the juror did not know exactly when he could return," and "the trial was almost over and the other jurors, alternates, and witnesses were being kept waiting." (*Id.* at p. 288.) The Court of Appeal concluded this was not an abuse of discretion, explaining: "The court made a reasonable inquiry into good cause through its phone contact with juror No. 2 and the conference with the parties. The court

16

found juror No. 2 needed to take his son to the doctor and, although he believed he could be back by 1:30 p.m., he was unable to make any firm commitments regarding when he would return. In addition, from the facts presented, the court made a reasonable and permissible inference juror No. 2 might not be able to return at all that day. In the meantime, the other 11 jurors and 2 alternates were waiting for court to convene. In addition, at least five of the People's six scheduled witnesses were waiting to testify. Thus, the court made an adequate inquiry and no further investigation was required." (*Ibid*.)

In contrast, here, the trial court had no information as to whether Juror No. 4 would arrive in a matter of minutes due to traffic delays, or whether he was absent for some other more serious reason. Nor did the trial court hold the conference that was held in *Bell, supra,* 61 Cal.App.4th 282, with defendant and counsel present, in an attempt to make an informed decision on the matter. Moreover, even if Juror No. 4 was unable to serve as a juror for the entire day, like the juror in *Bell*, the trial in this case was being continued for a day anyway due to defense counsel's illness. Thus, there were no waiting jurors or witnesses making judicial efficiency a consideration here. The trial court could have removed and replaced Juror No. 12, for whom good cause for removal was abundantly clear, and excused the jury for the day. If Juror No. 4 was merely running late, he could have been admonished for his tardiness upon his arrival and also ordered to return the following day. If he never arrived, that could have been addressed in a hearing the following day, with defendant and counsel present, or if his inability to serve as a juror was *clearly* established in the meantime, the trial court could *then* have removed him without holding such a hearing. (See *Mendes*, *supra*, 23 Cal.3d at p. 852.)

We recognize an exercise of discretion "is not rendered abusive merely because other alternative courses of action may have been available to the trial judge." (*People v. Hall* (1979) 95 Cal.App.3d 299, 307.) However, here, the course of action chosen by the

trial court did not amount to making a "reasonable inquiry" to determine whether or not Juror No. 4 was able to perform the duties of a juror. (*Bell*, *supra*, 61 Cal.App.4th at p. 287.) Nor was his "inability to perform those duties . . . shown on the record to be a 'demonstrable reality.' " (*Ibid.*, quoting *People v. Holt* (1997) 15 Cal.4th 619, 659.)

### D.

### *Constitutional Claim*

We now address defendant's contention that, in addition to amounting to an abuse of discretion, the trial court's decision to discharge Juror No. 4 in these circumstances violated defendant's constitutional rights "to be personally present and to be represented by counsel at critical stages during the prosecution." (*United States v. Thompson* (9th Cir. 1987) 827 F.2d 1254, 1258 (*Thompson*).)

"[A] criminal defendant has a right to be personally present at certain pretrial proceedings and at trial under various provisions of law, including the confrontation clause of the Sixth Amendment to the United States Constitution, the due process clause of the Fourteenth Amendment to the United States Constitution, section 15 of article I of the California Constitution, and sections 977 and 1043." (*People v. Cole* (2004) 33 Cal.4th 1158, 1230; *People v. Kelly* (2007) 42 Cal.4th 763, 781-782 (*Kelly*).) "Although . . . this privilege of presence is not guaranteed 'when presence would be useless, or the benefit but a shadow,' [citation], due process clearly requires that a defendant be allowed to be present 'to the extent that a fair and just hearing would be thwarted by his [or her] absence,' [citation]. Thus, a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his [or her] presence would contribute to the fairness of the procedure." (*Kentucky v. Stincer* (1987) 482 U.S. 730, 745 [96 L.Ed.2d 631].) In addition to the right of personal presence, a criminal defendant also has a right to the assistance of counsel at all " 'critical' stages of the proceedings" under various provisions of the state and federal Constitutions. (*United States v. Wade*

18

(1967) 388 U.S. 218, 224-225 [18 L.Ed.2d 1149]; *Thompson*, *supra*, 827 F.2d at p. 1258; *People v. Ayala* (2000) 24 Cal.4th 243, 259-269 (*Ayala*).)

While these rights to personal presence and assistance of counsel at all critical stages of the proceedings obviously overlap, they are not coextensive. For example, "a defendant may ordinarily be excluded from conferences on questions of law, even if those questions are critical to the outcome of the case, because the defendant's presence would not contribute to the fairness of the proceeding." (*People v. Perry* (2006) 38 Cal.4th 302, 312.) In *Kelly*, *supra*, 42 Cal.4th 763, our Supreme Court held the defendant's right to personal presence was not violated when he was excluded from certain legal discussions during jury selection regarding the removal of three prospective jurors, noting defense counsel was present during these discussions and nothing in the record suggested the defendant's presence would have made any difference. (*Id*. at pp. 781-782.) In contrast, in *Ayala*, *supra*, 24 Cal.4th 243, our Supreme Court held it was state law error to exclude both the defendant *and defense counsel* from a hearing on the defendant's *Wheeler* motion[2] regarding the prosecution's exercise of peremptory challenges against certain prospective jurors and noted the error "may amount to a denial of due process," but concluded the error was harmless under both the state and federal standards for assessing prejudice. (*Id*. at p. 264, italics added; see *Thompson*, *supra*, 827 F.2d at p. 1261 [exclusion of defense counsel from *Batson* hearing violated due process and was not harmless].) The "obvious difference between excluding both the defendant and his [or her] attorney and merely excluding the defendant" from conferences on

---

[2]    *People v. Wheeler* (1978) 22 Cal.3d 258. "A *Wheeler* motion is brought during voir dire of a jury panel when a party asserts the opposing party is improperly exercising peremptory challenges on the basis of group bias, i.e., to exclude members of a legally cognizable group." (*People v. Morris* (2003) 107 Cal.App.4th 402, 405, fn. 1.) The federal counterpart to a *Wheeler* motion is brought under *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69] (*Batson*).

questions of law is the attorney is "able to fully represent [the] defendant's interests" during such conferences. (*Kelly*, *supra*, at p. 782.)

Here, both defendant and Barton were excluded from the removal decision. And, as we explain, O'Connor's presence was tantamount to no representation at all. Thus, we must determine whether or not the juror substitution that occurred in this case amounted to a critical stage of the proceedings against defendant entitling him to the assistance of counsel during the substitution. Because we conclude the answer is "yes," we need not determine whether his personal presence was also constitutionally required, or whether instead such presence " 'would be useless, or the benefit but a shadow.' " (*Kentucky v. Stincer*, *supra*, 482 U.S. at p. 745.)

We first note a juror substitution is not "necessarily . . . a critical stage in the proceedings such that it gives the defendant the constitutional right to assistance of counsel." (*People v. Dell* (1991) 232 Cal.App.3d 248, 257 (*Dell*).) This observation flows by implication from *Mendes*, *supra*, 23 Cal.3d 847, in which our Supreme Court held that "[u]nless the facts clearly establish a sufficient basis on which to reach an informed and intelligent decision, the court must conduct an appropriate hearing in the presence of litigants and counsel on the question of the juror's ability to serve." (*Id.* at p. 852.) Conversely, if the facts *do* clearly establish a sufficient basis for removing a juror, that removal may happen outside the presence of both the defendant and defense counsel. (See, e.g., *Dell*, *supra*, 232 Cal.App.3d at p. 257 ["we do not see how counsel's presence at the substitution could have made a difference"].)

However, in a situation such as existed in this case, where the removed juror's inability to serve is not clear, the presence of counsel could make all the difference. If the trial court's reasons for removing the juror are legally insufficient to establish good cause for removal, or the record does not show the juror's inability to serve to be a demonstrable reality, arguments can be made and the decision to remove that juror

20

swayed. While, at the time of a juror substitution, both the jurors and the alternates have been approved by the defense, there may be tactical reasons for counsel to decline to exercise a peremptory challenge against an alternate, whereas such a challenge may well have been used had that individual been seated in the jury box. And the fact it would be too late to challenge the alternate at that point does not negate the fact the defendant is entitled to proceed with the sitting juror on the panel unless and until good cause for removal is shown to be a demonstrable reality. Counsel's presence in such a situation protects the defendant against the loss of this right.

While defendant was represented by O'Connor when Juror No. 4 was removed, we agree with defendant she "did not function as the 'counsel' contemplated by the constitutional guarantee." (*Wilson v. State* (Fl.Dist.Ct.App. 2000) 764 So.2d 813, 816.) O'Connor was not defendant's assigned counsel and apparently had no prior knowledge of defendant's case. She was standing in for Barton for the express purpose of agreeing to a one-day continuance and having the jury informed of that fact. She made no objection when the trial court announced it would also be removing Juror No. 4, essentially for tardiness, without any information as to whether he was unable to perform his duties as a juror or simply stuck in traffic due to roadwork in the area. While O'Connor was "a warm body sitting in counsel's chair," she was not there to represent defendant for any purpose other than agreeing to a continuance. (*Ibid*.)

We therefore conclude defendant's constitutional right to be represented by counsel at critical stages during the prosecution was violated. (See, e.g., *Thompson*, *supra*, 827 F.2d at p. 1258; *Dunn v. State* (2011) 308 Ga.App. 103, 105-106 [removal of juror without good cause outside presence of the defendant and defense counsel violated the defendant's constitutional rights].)

21

## E.

### *Prejudice*

We now turn to the question of prejudice. In *Rushen v. Spain* (1983) 464 U.S. 114 [78 L.Ed.2d 267] (*Rushen*), a case involving two ex parte conversations between the trial court and one of the jurors regarding whether that juror should be removed because of a possible bias, the United States Supreme Court assumed for purposes of the opinion that the defendant's "constitutional rights to presence and counsel were implicated" by these ex parte conversations with the juror, as the California Court of Appeal concluded on direct appeal, and as the federal district court and the United States Court of Appeals for the Ninth Circuit concluded in federal habeas proceedings (*id*. at p. 117 & fn.2), but unlike the Ninth Circuit (and like the California Court of Appeal), the high court held such a violation was subject to a harmless error analysis rather than being prejudicial per se. (*Id*. at pp. 117-120.) There, evidence of a murder that was not related to the crimes for which the defendant (and several co-defendants) were being tried came out during trial, causing the juror to realize she knew that murder victim and prompting her to reveal this to the trial judge in the two ex parte conversations. (*Id*. at p. 116.) Describing the conversations as "innocuous," the high court concluded the lower federal courts should have deferred to the "presumptively correct state court finding" that holding these conversations outside the presence of defendant and defense counsel was harmless beyond a reasonable doubt. (*Id*. at pp. 120-121.)

We cannot conclude beyond a reasonable doubt the removal of Juror No. 4 in this case was harmless. Unlike *Rushen*, *supra*, 464 U.S. 114, where there did not appear to have been any good cause for removal of the juror, and therefore the presence of defendant and defense counsel likely would not have made a difference with respect to the trial court's decision not to remove her, here, Juror No. 4 was removed from the jury without a showing of good cause and the presence of defendant's assigned counsel, or at

22

least stand-in counsel prepared to do more than simply agree to a continuance, would likely have prevented that removal.

Nevertheless, relying on *Dell*, *supra*, 232 Cal.App.3d 248, the Attorney General argues defendant could not have been prejudiced by the removal because Juror No. 4 was replaced by an alternate, who was "selected from the same source, in the same manner, with the same qualifications and . . . subject to the same challenges," and who had "an equal opportunity to observe the entire proceedings and [took] the same oath as the regular jurors." (*Id*. at p. 256.) However, as previously explained, *Dell* involved the removal of a juror where good cause for that removal was clear, and therefore, the removal of that juror outside the presence of the defendant and defense counsel did not amount to an abuse of discretion, let alone a constitutional violation. Accordingly, *Dell* is manifestly inapposite.

In sum, defendant was entitled to have Juror No. 4 on the jury, at least until his inability to serve appeared as a demonstrable reality. The improper removal of that juror without good cause outside the presence of defendant and counsel prepared to represent his interests in the removal matter violated his constitutional right to be represented by counsel at critical stages during the prosecution. Thus, unless we can conclude beyond a reasonable doubt that the replacement of this juror did not contribute to the verdict rendered against him, we must reverse. We simply do not know what the jury would have done had Juror No. 4 not been removed. The evidence against defendant, while sufficient to support his convictions (except with respect to Count 6, as explained below), was based on statements and testimony by victims who were between three and five years of age when the alleged sexual acts occurred, including parts that were not consistent or credible. And there were certain voir dire responses provided by the alternate who replaced Juror No. 4 that suggested at least a potential bias in favor of the prosecution.

For these reasons, we cannot conclude beyond a reasonable doubt the removal of Juror No. 4 was harmless.

## II

### *Sufficiency of the Evidence*

Defendant also claims his convictions for Counts 3 and 6 must be reversed for insufficient evidence. We address these claims because, as our Supreme Court has explained, "an appellate ruling of legal insufficiency is functionally equivalent to an acquittal and precludes a retrial." (*People v. Hatch* (2000) 22 Cal.4th 260, 272; *Burks v. United States* (1978) 437 U.S. 1, 18 [57 L.Ed.2d 1].) We conclude sufficient substantial evidence supports Count 3. Not so with respect to Count 6.

### A.

### *Standard of Review*

" 'In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]' [Citations.] All conflicts in the evidence and questions of credibility are resolved in favor of the verdict, drawing every reasonable inference the jury could draw from the evidence. [Citation.] Reversal on this ground is unwarranted unless ' "upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' [Citation.] This standard applies whether direct or circumstantial evidence is involved. [Citation.]" (*People v. Cardenas* (2015) 239 Cal.App.4th 220, 226-227.) " 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing

24

court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' [Citation.]" (*People v. Perez* (1992) 2 Cal.4th 1117, 1124.)

## B.

### *Count 3*

Defendant was convicted of having sexual intercourse with H., a child 10 years of age or younger, in violation of section 288.7, subdivision (a). As defendant correctly observes, the only specific evidence that he engaged in such an act with H. came during her forensic interview with Brophy. In the interview, after H. disclosed defendant put carrots into her vagina at the house in Hornbrook, she pointed to various stuffed animals and other items in the interview room and said he "put all the stuff in [her] pee-pee," which Brophy characterized as H. "try[ing] to be pleasing to the interviewer" by adding to her answer, whether true or not. Brophy then asked whether H. remembered telling her about something that happened "at the pool," referring to her previous conversation with H., during which the child said defendant put *his fingers* inside her vagina at the recreational pool in Hornbrook. H. answered: "He just put carrots in my pee-pee at the pool." When Brophy then asked whether she had seen defendant's "pee-pee," H. said: "He put it together with my pee-pee." Brophy asked where that happened. H. answered, "[a]t the trailer," i.e., where the family lived in Texas. Brophy then established H. knew the difference between inside and outside and asked: "Did your daddy put his pee-pee inside your pee-pee or outside your pee-pee?" H. answered: "Inside my pee-pee." Brophy asked what happened then, to which H. responded: "He put the teddy bear in my pee-pee too." Later in the interview, Brophy asked: "How did your daddy get his pee-pee into your pee-pee *in the pool*?" (Italics added.) H. answered: "Like he put inside *his finger* in my pee-pee like this." (Italics added.) Brophy again asked: "Did he put his pee-pee in your pee-pee *in the pool*?" H. answered: "*Yes*." (Italics added.) Finally, during

25

the portion of the interview where H. colored the anatomical drawing of the little girl, Brophy said: "And yellow is where he touched you with his pee-pee." H. said: "In my pee-pee and my butt."

Highlighting a number of "fantastical claims" made by H. during the interview, e.g., the claim defendant put stuffed animals in the interview room into her vagina and the additional claim her mother was also involved in one of the incidents of abuse and killed defendant when he did not stop, as she asked, and further pointing out it was Brophy who "first and repeatedly suggested that an act of sexual intercourse had happened at the pool," as opposed to at the trailer in Texas, defendant argues the evidence "was too unreliable to support a finding beyond a reasonable doubt that [he] had engaged in an act of sexual intercourse [with H.] after the family moved to California."

We conclude the evidence recounted above is sufficiently substantial to support the jury's finding defendant engaged in an act of sexual intercourse with H. in California. Brophy specifically asked H. whether defendant put his penis inside her vagina at the recreational pool in Hornbrook. She said he did. Defendant does not dispute this out-of-court statement was properly admitted into evidence for the truth of the statement. Nor could he. (See Evid. Code, § 1235 [hearsay exception for prior inconsistent statements]; see also *id*., § 1360 [hearsay exception for victim of child sexual abuse when under 12 years of age].) Of course, as defendant points out: " 'The admissibility and substantiality of hearsay evidence are different issues.' [Citation.] . . . Except in those instances recognized by statute where the reliability of hearsay is established, 'hearsay evidence alone "is insufficient to satisfy the requirement of due process of law, and mere uncorroborated hearsay does not constitute substantial evidence. [Citation.]" ' [Citations.]" (*In re Lucero* (2000) 22 Cal.4th 1227, 1244-1245.) Here, while there was no independent evidence of the specific act of intercourse alleged, there was plenty of corroboration with respect to defendant's other acts of sexual abuse committed against

the child victims in this case. In other words, the fact defendant inserted his fingers and carrots into both of his daughters' vaginas, played "pee-pee kissing games" with them, and also inserted his finger into M.'s vagina lends circumstantial support to H.'s statement he also inserted his penis into her vagina at the pool. (See Evid. Code, § 1108, subd. (a); see also *People v. Merriman* (2014) 60 Cal.4th 1, 40 [evidence of sexual assault cross-admissible under Evidence Code section 1108 to show the defendant's propensity to commit rape and forcible oral copulation].) It was for the jury to decide whether to believe H.'s statement in light of some of the more fantastic statements she also made during the forensic interview.

We conclude sufficient substantial evidence supports defendant's conviction in Count 3. As such, defendant may be retried as to this count.

## C.

### *Count 6*

Defendant was also convicted of the continuous sexual abuse of H., a child under the age of 14 years, in violation of section 288.5, subdivision (a). This provision is violated "if the defendant (1) resided with, or had recurring access to, a child under fourteen, and (2) committed three or more acts of sexual molestation of the child, and (3) three or more months passed between the first and the last act of molestation." (*People v. Vasquez* (1996) 51 Cal.App.4th 1277, 1287.) Defendant does not challenge the sufficiency of the evidence supporting the first two elements. Instead, relying on *People v. Mejia* (2007) 155 Cal.App.4th 86, 94 (*Mejia*), he argues the evidence in this case does not support a reasonable inference that at least three months elapsed between the first incident of abuse perpetrated against H. in California and the last such incident. We agree.

In *Mejia*, *supra*, 155 Cal.App.4th 86, the defendant was charged with and convicted of the continuous sexual abuse of the victim "on or between June 1, 2004 and

27

September 17, 2004," the latter date being the day before the victim's fourteenth birthday. (*Id*. at p. 93.) Concluding there was "no reasonable, credible, solid evidence to support a nonspeculative inference that the three-month minimum time period element was satisfied," the Court of Appeal explained: "Construing the victim's testimony in the light most favorable to the People's case, the evidence showed defendant first abused her sometime in June 2004, when she was in eighth grade. There were 10 instances of abuse by defendant between June and the start of ninth grade sometime 'around July' of that year. The victim also testified that during the 12-week period from June through August 2004, defendant molested her more than three times. In September of that year, defendant molested her at least twice. While on direct examination, the victim testified generally that defendant molested her 'two or three days a week,' but she clarified that defendant did not molest her every week within that time period. [¶] Accordingly, the only reasonable inference permitted by the evidence was that defendant's abuse began sometime in June and continued to some date in September—but the jury could only speculate that the first incident occurred early enough in June to satisfy the 90-day requirement expiring on September 17, 2004. Indeed, there was no evidence as to when defendant abused her in September, including whether the abuse occurred before and/or after her birthday. As defendant correctly argues, although there was ample evidence that at least three sexual qualifying offenses occurred during the charging period, there was no substantial evidence that at least three months elapsed between the first and third offense committed against her as a 13-year-old." (*Id*. at pp. 94-95.)

Here, defendant was charged with and convicted of the continuous sexual abuse of H. "between May 1, 2013 and July 31, 2013." Accordingly, we must determine whether there is reasonable, credible, and solid evidence the first incident of sexual abuse perpetrated against H. in California happened early enough in May and the last such incident happened late enough in July such that at least 90 days elapsed between these

28

incidents. While there is evidence the family moved from Texas to California "sometime in May," there was no evidence the move happened at the very beginning of the month. Thus, even assuming the last incident of sexual abuse happened on July 31, there is no substantial evidence the first such incident in California happened early enough in May for 90 days to have passed between that first incident and the last incident. For this reason, we must conclude there is not sufficient substantial evidence to support defendant's conviction in Count 6. As such, defendant may not be retried as to this count. The Attorney General does not argue otherwise.

DISPOSITION

The judgment is reversed and the matter is remanded for retrial as to Counts 1 through 5 and 7, if the People so elect.

/s/
HOCH, J.

We concur:

/s/
HULL, Acting P. J.

/s/
RENNER, J.