Filed 8/26/24  P. v. Salazar CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　v.<br><br>JOHN DAVID SALAZAR,<br><br>　　Defendant and Appellant. | D082411<br><br><br>(Super. Ct. No. FSB1200952) |

　　APPEAL from an order of the Superior Court of San Bernardino County, Annemarie G. Pace, Judge.  Affirmed.

　　Johanna Pirko, under appointment by the Court of Appeal, for Defendant and Appellant.

　　Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Junichi P. Semitsu and Eric A. Swenson, Deputy Attorneys General, for Plaintiff and Respondent.

# I

## INTRODUCTION

John David Salazar and codefendants Jose Ramon Lara and Anthony John Legaspi are members of the Varrio Redlands (VR) criminal street gang. One day, Legaspi was attacked by a group of 10 to 15 Black men, which humiliated him in the eyes of his fellow gang members. Later that day, Lara provided a loaded firearm to Legaspi and Salazar drove him to the area where he had been jumped. There, Legaspi shot at five Black teenagers he mistakenly believed to have been involved in the attack, killing two of them. A jury found all three defendants guilty of the murders of two of the teenagers, Quinn McCaleb and Andrew Jackson, and it found them guilty of the attempted murders of the remaining three teenagers, T.T., J.H., and A.P.

In this postjudgment proceeding, Salazar appeals an order denying a petition seeking vacatur of his convictions and resentencing under Penal Code section 1172.6.[1] He argues the trial court erred by denying his petition because substantial evidence does not support the court's finding that he remains guilty of the two murders and three attempted murders under current law. Alternatively, he asserts a remand is necessary for the trial court to consider his relative youth (he was 21 years old at the time of his crimes) when assessing whether he formed the requisite mens rea to sustain the two murder convictions under the theory that he aided and abetted implied malice murders. We reject these arguments and affirm the order denying the resentencing petition.

---

[1] Further undesignated statutory references are to the Penal Code.

2

# II

# BACKGROUND

A. *The Trial and Direct Appeal*

On March 4, 2013, the San Bernardino County district attorney charged Salazar, Lara, and Legaspi by first amended information with the first degree murders of McCaleb and Jackson (counts 1 and 2; § 187, subd. (a)); the attempted willful, deliberate, and premeditated murders of T.T., J.H., and A.P. (counts 3–5; §§ 187, subd. (a), 664, subd. (a)); and street terrorism (count 7; § 186.22, subd. (a)). The district attorney also charged Lara with being an accessory after the fact (count 6; § 32). For the murder and attempted murder charges, the amended information alleged a principal (Legaspi) personally and intentionally discharged a firearm, causing great bodily injury or death. (§ 12022.53, subds. (b)–(d), (e)(1).) It also alleged gang enhancements for the murder, attempted murder, and accessory-after-the-fact charges (§ 186.22, subd. (b)), and it alleged prison prior enhancements against Salazar and Lara (§ 667.5, subd. (b)).

After a trial, a jury found the defendants guilty of all charges and found the firearm and gang enhancement allegations true. In a bifurcated proceeding, Salazar and Lara admitted the prison priors. The trial court sentenced Salazar and Lara to indeterminate prison terms of 197 years to life. It sentenced Legaspi to an indeterminate prison term of 220 years to life.

The defendants appealed their judgments and our court reversed Salazar and Lara's first degree murder convictions pursuant to *People v. Chiu* (2014) 59 Cal.4th 155, which held that an aider and abettor may be convicted of second degree murder, but not first degree premeditated murder, under

3

the natural and probable consequences doctrine.[2] (*People v. Legaspi* (Mar. 17, 2016, D068710) [nonpub. opn.].)  We remanded the matter to the trial court with instructions to give the district attorney an opportunity to accept reductions of Salazar and Lara's murder convictions to second degree murder or retry them for first degree premeditated murder on the ground they were direct aiders and abettors.  (*Ibid.*)  On remand, the district attorney agreed to reduce the murder convictions to second degree murder.

B. *Petition for Resentencing*

After the Legislature enacted Senate Bill No. 1437 (2017–2018 Reg. Sess.), Salazar filed a petition to vacate his murder and attempted murder convictions and to be resentenced under former section 1170.95, which has since been renumbered as section 1172.6.  The trial court appointed counsel for Salazar, found he stated a prima facie case for relief, and set an evidentiary hearing.  Salazar filed a brief in support of his petition and the district attorney filed briefs in opposition.  The parties did not submit new evidence at the evidentiary hearing; instead, they relied solely on the record from the original trial.[3]

1. *Trial Testimony of the Victims*

All three of the attempted murder victims, A.P., T.T., and J.H., testified at the trial.

A.P., T.T., J.H., McCaleb, and Jackson were friends or acquaintances of one another.  On January 5, 2011, shortly after 6:45 p.m., they met at

---

[2]    We also corrected a sentencing error in Lara and Salazar's judgments.

[3]    We granted Salazar's unopposed request for judicial notice of the record from Appeal No. D068710, which contains the clerk's transcripts and reporter's transcripts from the original trial.

4

McCaleb's house in Redlands with plans to go see a movie.[4] None of the teenagers was carrying a weapon, none of them had a confrontation with anyone else that day, and there is no evidence any of them was a gang member.

The teenagers walked through an alleyway behind an apartment building en route to a playground area. As they walked, A.P. noticed a car stopped on the street near the entrance to the alleyway. After the teenagers reached the playground area, a slim Hispanic male wearing a black hooded sweatshirt—later identified as Legaspi—emerged from behind a corner near the alleyway. He held a semiautomatic handgun and shouted something about "where he was from." He raised the handgun and fired several shots at the unsuspecting teenagers, striking McCaleb, Jackson, T.T., and J.H. T.T., J.H., and A.P. survived the attack, but McCaleb and Jackson were killed.

2. *Trial Testimony of Codefendant Adrian Powers*

Adrian Powers was charged as a codefendant in the felony complaint the district attorney originally filed against Lara, Salazar, and Legaspi. He accepted a plea deal whereby he agreed to plead guilty to voluntary manslaughter and manslaughter in connection with a criminal street gang if, in exchange, he cooperated with law enforcement and testified truthfully in hearings involving his codefendants. During his trial testimony, he provided the following version of events, which served as the lynchpin for the prosecution's case.

Lara, Salazar, and Legaspi were VR gang members and Powers was an associate of the VR gang. At the time of the events described herein, Lara was 27 years old, Salazar was 21 years old, Legaspi was 17 years old, and Powers was 16 years old.

---

4    Unless otherwise noted, all dates refer to the year 2011.

On January 5, shortly after 5:30 p.m., Legaspi arrived at the home of Jimmy Romero (Jimmy), a fellow VR gang member, and Roger Romero (Roger), a member of a VR-affiliated gang. Jimmy, Roger, Salazar, and Powers were congregated at the Romero home. When Legaspi arrived, he told his comrades he had been jumped earlier in the day by 10 to 15 Black men while he was trying to deliver drugs to someone. Legaspi told the others his assailants said "bad stuff," and one of them reached into his backpack and said, "You don't want any of this." Legaspi believed the man had a gun, so he ran away from his attackers.

Roger teased Legaspi about the incident and asked why he allowed it to happen. Roger said, "Back in my day, I would not [have] allow[ed] that. If it was me, I would have [gone] there and talked to them and already handled the issue." These comments angered and embarrassed Legaspi. Salazar, Legaspi, and Powers then left the Romero home and walked to Lara's house, two doors down. On the way there, Salazar and Legaspi said, "let's go get it, let's go get it," and Salazar added, "let's go get mine." At trial, the prosecution argued the men were referring to a firearm owned by Salazar—i.e., the prosecution claimed Salazar and Legaspi planned to procure a gun owned by Salazar for Legaspi to use to retaliate against his attackers.

When Salazar, Legaspi, and Powers arrived at Lara's house, they met up with Lara and Todd Romero (Todd) in Lara's converted garage. After two or three minutes, Salazar and Legaspi left. Salazar said they were going to his house—presumably to get Salazar's gun—and would be back. While they were gone, Lara laughed at the situation and said, "it was [Legaspi's] own fault he got jumped" because he was "walking over there by himself." Salazar and Legaspi returned after 20 minutes and Lara instructed Powers to wait

6

outside the garage.[5]  Powers complied, went outside, and smoked marijuana while Lara, Salazar, Legaspi, and Todd remained in the garage.

After a few minutes, Powers peeked in the screen door of the garage. Legaspi and Salazar were standing up and facing a couch.  Meanwhile, Lara was seated on the couch and holding a black object wrapped in a blue bandana.[6]  The black object had a red dot on its handle.  In the past, Lara had shown Powers a semiautomatic firearm with a red dot on its handle wrapped in a blue bandana; therefore, Powers believed Lara was holding the same firearm.  Soon after Powers peeked inside the garage, someone closed the screen door on him.

A few minutes later, someone opened the door and let Powers back in the garage.  When Powers came inside, Legaspi was wearing a black hooded sweatshirt, his hand was tucked inside the front pocket of the sweatshirt, and a blue bandana was peeking out of the pocket.  Salazar said, "Let's go, let's go find out where he got jumped at," and Salazar, Legaspi, and Powers got into Salazar's car.  Salazar sat in the driver seat, Legaspi sat in the front passenger seat, and Powers sat in the backseat behind the driver seat.  Todd came out to the car and opened the car door, but at the last minute said, "No, you guys are cool. Go ahead," and closed the door without getting into the car. At trial, Powers claimed he did not think anyone would be shot or killed at that time.  However, based on his association with the VR gang, he knew

[5]      In an interview with law enforcement, Powers stated that, upon their return to Lara's garage, Salazar and Legaspi said they were "unable to get it."  According to the prosecution, Salazar and Legaspi had tried—but were unable—to obtain Salazar's gun.

[6]      Powers testified he did not see where Todd was standing or sitting in the garage when he peeked inside it.

"talking crap" to a VR member could easily escalate into violence and a fight was always a possibility when he hung out with Salazar and Legaspi.

Salazar drove his car to the area where Legaspi had been jumped and Legaspi pointed somewhere outside the car and said, "I seen them. I seen the guys who jumped me." Powers could not tell exactly where Legaspi was pointing from his position in the backseat, but he saw a man with a backpack walking around the corner of a building. Salazar parked his car near the end of the cul-de-sac by the building. He kept the car running and the car headlights turned off. Legaspi said, "That's them. That's them. That's them. That's the guys who jumped me." Salazar added, "All right, let's get them."

Legaspi and Powers exited the car and jogged in the direction of the man wearing the backpack, with Legaspi running several feet ahead of Powers. Legaspi had his hand in his jacket pocket, and he held the black object wrapped in the blue bandana. He turned one corner of a building and then a second corner. Moments later, before Powers could turn the second corner, Powers heard multiple gunshots. He immediately turned around, ran to the car, got into the backseat, and urged Salazar to drive, but Salazar said, "No, not without Anthony [Legaspi]." Ten or fifteen seconds later, Legaspi ran back to the car and climbed into the front passenger seat. When Legaspi got in, Powers asked him what happened and whether he was okay. Legaspi assured his comrades he was okay and told Salazar to take him to his house. Salazar remained silent, drove away at a normal speed, and kept his headlights turned off until the car was a block away.

Salazar then drove the group to Legaspi's house in Beaumont. Once there, Salazar and Legaspi went inside and told Powers to wait in the car. About twenty minutes later, Salazar and Legaspi returned to the car and Salazar drove all three of them back to Lara's house. They walked into

8

Lara's garage, which was unoccupied, and turned off the lights and the television. Then, both Salazar and Legaspi cursed for a while and said they had messed up.

A few minutes later, Salazar, Legaspi, and Powers left Lara's garage, went to Todd's house, and joined a group of people congregated around a firepit. Lara arrived at Todd's house about 15 minutes later. Legaspi used the firepit at Todd's house to burn the black hooded sweatshirt he had worn during the shootings.

The next day, Powers walked to a liquor store and ran into Legaspi while he was en route to the store. Legaspi threatened Powers not to speak to law enforcement and chastised him for running away the previous day, rather than picking up the empty shell casings. He added that Powers was lucky he was not a full-fledged gang member, as he would have been beat up and "jumped" out of the gang for not picking up the shell casings if he was a member.[7]

Two days later, Powers went to Lara's house and Lara, Legaspi, and another man were present. The television was playing a news program that referenced the murders and Legaspi said, "Damn, I wonder how many I shot or how many shots I fired." All of the men laughed. A day or two later, Powers returned to Lara's home and learned that Salazar had driven

---

[7] On two other occasions after the shootings, Salazar and Lara also instructed Powers not to speak with law enforcement.

Legaspi, Lara, and another man out to the desert to dispose of the murder weapon.[8]

### 3. *Cell Phone Records*

On January 5, between the hours of 5:30 p.m. and 9:28 p.m., Salazar and Lara called each other on their cell phones a total of twelve times.

### 4. *Gang Evidence*

Redlands police officer Chad Mayfield testified as the prosecution's gang expert. In 2011, when the shootings occurred, he was a member of the department's specialized gang division.

According to Mayfield, VR is a predominately Hispanic gang in Redlands that has between 50 and 100 members and 150 and 200 associates. The parties stipulated that VR is a criminal street gang within the meaning of section 186.22, subdivision (f). Its primary activities include narcotics sales, weapons assaults, and theft offenses, such as robbery, burglary, possession of stolen property and vehicles, and carjacking. Its members engage in, or have engaged in, a pattern of criminal gang activity, and the parties stipulated to five predicate offenses perpetrated by VR gang members.

Mayfield testified that Salazar, Lara, and Legaspi are all active members of VR. According to Mayfield, Lara holds a higher status in the gang than Salazar or Legaspi. Lara is a "mid-level manager" within VR, so "the less influential members check in with him, keep him posted, [and] keep him updated on the business of Varrio Redlands." Mayfield agreed with the prosecutor that Lara has the ability to oversee the criminal activities of

---

[8]     In a post-arrest interview with a detective from the Redlands police department, Lara admitted to helping dispose of the murder weapon in the desert and provided directions to its purported location, but law enforcement was unable to locate the weapon.

10

lower-level gang members.  In his position, Lara can "make decisions within the gang and ... send out lower-level gang members to do Varrio Redlands business."

In Mayfield's experience, VR members do not view Black people fondly and they "do not want black gangs to start up in the city of Redlands." Mayfield testified that a VR gang member complaining to fellow gang members about an attack from a group of Black people would invite a response from the gang.  According to Mayfield, VR members would want to maintain their respect level in the neighborhood and show that Black people cannot threaten them.  He also testified that VR would not send two or three unarmed members to retaliate against a larger group of 10 to 15 men.  He stated that if VR went to retaliate against a rival group, it could "turn into a shooting and homicide," especially if the rival group had weapons or if its members outnumbered the VR members.  Mayfield testified that, as far as he was aware, VR members did not use getaway drivers merely to instigate a fist fight or a physical fight.

C. *Resentencing Order*

At the evidentiary hearing, the trial court denied Salazar's resentencing petition and a separate resentencing petition filed by Lara.

In issuing its ruling, the court summarized the prosecution's theory of the case as follows:  "[T]he People have argued today that with respect to the murder charges, that the petitioners aided and abetted Legaspi, who was the actual killer, with at least implied malice and then also with the express malice of intent to kill. [¶] The People also assert that the petitioners aided and abetted the attempted murders with intent to kill."  Then, after summarizing these theories, the court concluded. "[T]he People have met their burden of proof as to the theories they assert[ed]."

11

The court issued a detailed set of factual findings, including findings that "Lara provided the loaded murder weapon to Legaspi in the presence of Salazar," and Salazar "drove Legaspi and Adrian Powers ... to the area where Legaspi was jumped" and "away from the crime scene" after the shootings. The court found the petitioners' "words or conduct did, in fact, aid and abet the perpetrator['s] commission of the crime. [¶] . . . [¶] But for the actions of each petitioner, these crimes could not have been committed. [¶] The 17-year-old killer did not have a gun or a car, both of which were necessary to commit the crime. [¶] . . . [¶] Both before and after the crimes, Lara was involved in the planning. Both before, during, and after the crime, Salazar was actively involved in each stage. ... [¶] But for the substantial actions of each petitioner, Andrew Jackson and Quinn McCaleb would be alive. [T.T.] and [J.H.] would not have been shot, and [A.P.] would not have [been] shot at." On the issue of mens rea, the court found that "each [petitioner] knew exactly what Legaspi was going to do with the firearm he was given and they knew the mortal danger he posed to the young men he was going to confront." In closing, the court determined the "jury made the correct verdict," the petitioners' "sentences were commensurate with their actions," and the petitioners did not "fall within the spirit" of the murder resentencing law.

## III

## DISCUSSION

A. *Senate Bill No. 1437*

After Salazar's judgment became final, the Legislature passed Senate Bill No. 1437, which went into effect January 1, 2019. The Legislature approved the law to address a perceived "need ... to more equitably sentence offenders in accordance with their involvement in homicides." (Stats. 2018, ch. 1015, § 1(b).) In so doing, it recognized that, "It is a bedrock principle of

12

the law and of equity that a person should be punished for his or her actions according to his or her own level of individual culpability." (*Id.*, § 1(d).)

"With this purpose in mind, Senate Bill [No.] 1437 'amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1(f).) Outside of the felony-murder rule, 'a conviction for murder requires that a person act with malice aforethought. A person's culpability for murder must be premised upon that person's own actions and subjective mens rea.' (*Id.*, § 1(g).)" (*People v. Curiel* (2023) 15 Cal.5th 433, 448 (*Curiel*).)

"Senate Bill [No.] 1437 altered the substantive law of murder in two areas. First, with certain exceptions, it narrowed the application of the felony-murder rule by adding section 189, subdivision (e) to the Penal Code. Under that provision, 'A participant in the perpetration or attempted perpetration of a [specified felony] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2.' (§ 189, subd. (e).)" (*Curiel, supra*, 15 Cal.5th at p. 448.)

"Second, Senate Bill [No.] 1437 imposed a new requirement that, except in cases of felony murder, 'a principal in a crime shall act with malice aforethought' to be convicted of murder. (§ 188, subd. (a)(3).) 'Malice shall

13

not be imputed to a person based solely on his or her participation in a crime.' (*Ibid*.) One effect of this requirement was to eliminate liability for murder as an aider and abettor under the natural and probable consequences doctrine." (*Curiel, supra*, 15 Cal.5th at p. 449.)

"Senate Bill [No.] 1437 also enacted former section 1170.95, which created a procedural mechanism 'for those convicted of felony murder or murder under the natural and probable consequences doctrine to seek relief' where the two substantive changes described above affect a defendant's conviction." (*Curiel, supra*, 15 Cal.5th at p. 449.) Thereafter, the Legislature enacted Senate Bill No. 775, effective January 1, 2022, which ensured "that persons who were convicted of attempted murder or manslaughter under a theory of felony murder and the natural probable consequences doctrine are permitted the same relief as those persons convicted of murder under the same theories." (Stats. 2021, ch. 551, § 1(a).) A year later, "former section 1170.95 was renumbered as section 1172.6 without substantive change. (Stats. 2022, ch. 58, § 10.)" (*Curiel*, at p. 449.) For the remainder of this opinion, we refer to this statutory resentencing provision as section 1172.6.

Under section 1172.6, a petitioner initiates the resentencing process by filing a declaration averring that: (1) a charging document was filed against the petitioner allowing the prosecution to proceed under a theory of felony murder, natural and probable consequences murder, murder under another theory by which malice is imputed to a person based solely on that person's participation in a crime, or attempted murder under the natural and probable consequences doctrine; (2) the petitioner was convicted of murder, attempted murder, or manslaughter following a trial, or accepted a plea offer in lieu of a trial at which the petitioner could have been convicted of murder or attempted murder; and (3) the petitioner could not presently be convicted

14

of murder or attempted murder because of the changes to the murder laws that were implemented by Senate Bill No. 1437. (§ 1172.6, subds. (a)(1)–(3), (b)(1).) If the petitioner states a prima facie case for relief, the court must issue an order to show cause and, in most cases, the court must schedule an evidentiary hearing to determine whether to vacate the murder, attempted murder, or manslaughter conviction, recall the sentence, and resentence the petitioner on any remaining counts. (*Id.*, subds. (c), (d)(1).)

At the evidentiary hearing, the prosecution bears the burden of proving, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under the amended laws. (§ 1172.6, subd. (d)(3).) "The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion." (*Ibid.*) "The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens. … If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (*Ibid.*)

On appeal from the denial of a resentencing petition after an evidentiary hearing, we review the trial court's factual findings for substantial evidence and its application of the facts to the resentencing statute de novo. (*People v. Hill* (2024) 100 Cal.App.5th 1055, 1066.) When we review the court's factual findings, "we consider the whole record in the light most favorable to the superior court's findings [citation], and we presume ' " 'every fact in support of the judgment the trier of fact could have

15

reasonably deduced from the evidence.' " ' [Citation.] We ask 'whether substantial evidence, defined as reasonable and credible evidence of solid value, has been disclosed, permitting the trier of fact to find guilt beyond a reasonable doubt.' [Citation.] And based on this whole record review, we ' "determine whether *any* rational trier of fact could have found the essential elements of the crime ... beyond a reasonable doubt." ' " (*Ibid.*) So long as "the trier of fact's determination is supported, reversal is not warranted, even where ' " 'the circumstances might also reasonably be reconciled with a contrary finding.' " ' " (*Ibid.*) " ' "The substantial evidence standard of review is generally considered the most difficult standard of review to meet, as it should be, because it is not the function of the reviewing court to determine the facts." ' " (*People v. Johnson & Johnson* (2022) 77 Cal.App.5th 295, 329.)

B. *Applicable Legal Principles*

"Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." (§ 187, subd. (a).) "Malice may be express or implied." (*In re Ferrell* (2023) 14 Cal.5th 593, 600.) "Malice is express when a defendant intends to kill ...." (*Ibid.*; see § 188, subd. (a)(1); *People v. Landry* (2016) 2 Cal.5th 52, 96 ["A finding of express malice requires evidence of an intent to kill"].) " 'Malice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 941–942.)

A defendant can "be convicted of murder (or other crimes) as a direct perpetrator or as an aider and abettor." (*People v. Prado* (2020) 49 Cal.App.5th 480, 487; see § 31.) " 'Aiding and abetting is not a separate offense but a form of derivative liability for the underlying crime.' [Citation.] Thus, '[g]uilt as an aider and abettor is guilt "based on a combination of the

16

direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state." ' " (*People v. Silva* (2023) 87 Cal.App.5th 632, 639–640; *Curiel, supra*, 15 Cal.5th at p. 467 [" 'aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea'—which here includes knowledge that the direct perpetrator intends to commit the crime or life-endangering act, 'and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime' "].)

"[T]o establish liability for murder under the theory of direct aiding and abetting, 'the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission.' [Citation.] In addition, ... an aider and abettor may be liable for murder under a theory of implied malice where the aider and abettor aids in the commission of a life-endangering act, with ' "knowledge that the perpetrator intended to commit the act, intent to aid the perpetrator in the commission of the act, knowledge that the act is dangerous to human life, and acting in conscious disregard for human life." ' " (*Curiel, supra*, 15 Cal.5th at pp. 466–467.) Thus, an aider and abettor acts with the requisite mens rea to sustain a murder conviction if he "know[s] the direct perpetrator intends to commit [a] murder or life-endangering act and intend[s] to aid the direct perpetrator in its commission." (*Id.* at p. 468.)

" 'Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' " (*People v. Stone* (2009) 46 Cal.4th 131, 136.) "A specific intent to kill requires express malice. [Citation.] Implied malice cannot support a conviction of attempted murder." (*People v. Rodriguez* (2024) 103

17

Cal.App.5th 451, 456.) "[T]o be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means that the person guilty of attempted murder as an aider and abettor must intend to kill." (*People v. Lee* (2003) 31 Cal.4th 613, 624.)

C. *Substantial Evidence Supports the Order Denying Resentencing*

There is no dispute between the parties that Legaspi was the direct perpetrator of the crimes and Salazar's liability depends on whether he directly aided and abetted Legaspi in the commission of the crimes. There is also no dispute that the evidence admitted at the evidentiary hearing was sufficient to support the trial court's actus reus findings—i.e., its findings that Legaspi perpetrated the crimes and Salazar assisted him in the commission of the crimes by driving him to and from the murder scene, offering him words of encouragement, and helping him dispose of the murder weapon after the shootings. However, the parties disagree about whether the evidence was sufficient to support the court's findings that Salazar acted with the mens rea needed to sustain the convictions under a direct aiding and abetting theory of liability. We conclude the evidence was sufficient to support the court's mens rea findings because there was substantial evidence that Salazar knew Legaspi intended to kill his victims and Salazar intended to aid Legaspi in the commission of the planned murders.

At trial, Powers testified that Salazar was present at the Romero home when Legaspi recounted to his fellow gang members and affiliates that a group of Black men had attacked him earlier that day. According to Powers, Legaspi told his comrades he believed at least one of the attackers was armed with a firearm. Powers also testified that Legaspi's reporting of the incident

18

prompted a member of the group (Roger) to tease Legaspi, causing him to become angry and humiliated. According to the prosecution's gang expert, officer Mayfield, an attack on a VR member would invite a response from the gang, which could include shootings and homicides—especially where, as here, the attackers outnumbered the VR members. This testimony established that Legaspi had a motive to kill his attackers in retaliation for their attack on him and Salazar was aware of Legaspi's deadly motive.

Immediately after Legaspi recounted his embarrassing attack to his fellow gang members, Salazar and Legaspi walked to Lara's house while saying, "let's go get it, let's go get it." According to Powers, he was asked to leave the garage while Lara, Salazar, Legaspi, and Todd remained inside. Still, he peeked in and witnessed Lara holding a black object with a red dot on its handle that was wrapped in a blue bandana—an object that matched Powers' description of the weapon Legaspi later used to shoot his victims. From this evidence, a reasonable fact finder could conclude Legaspi procured a loaded firearm from Lara with the aim of killing his attackers, Salazar was aware Legaspi obtained the firearm (and intended to help arm Legaspi), and Salazar and his companions hoped to keep their deadly plot as much of a secret as possible from non-gang members (Powers) until it unfolded.

Additional evidence about the execution of the crimes suggests that Salazar knew Legaspi intended to kill and Salazar sought to assist him in the commission of the murders. Cell phone records showed that, on the night of the shootings, Salazar was in constant contact with Lara, an accomplice who served as a mid-level manager within VR, oversaw the criminal activities of lower-level gang members, made decisions for the gang, and sent out lower-level gang members to do the gang's business. That night, Salazar drove Legaspi and Powers to the murder scene in search of the men who had

19

attacked him. After Legaspi claimed to have identified them, Salazar said, "let's get them," which suggests he knew about, and intended to promote, Legaspi's plan to kill them with the loaded firearm Lara had just given him. According to Powers, Salazar kept the car running and the car headlights turned off while Legaspi and Powers exited the car, suggesting he anticipated the need for a speedy and covert getaway from the fatal attack that was about to occur. There was also evidence showing that, after the shootings, Salazar seemingly was not surprised by the fact Legaspi had just unleashed a fusillade of bullets into his group of victims. According to Powers, just moments after gunfire erupted and Legaspi returned to the car, Salazar drove the car away at a normal speed and stayed silent—with no discussion between Legaspi and Salazar. The evidence of constant communication between Lara and Salazar, as well as the lack of any surprise or concern from Salazar after the fatal shootings, gives rise to a reasonable inference the shootings were part of a planned and coordinated deadly attack involving all three codefendants, not the result of an impulsive decision by Legaspi.

Furthermore, the fatal confrontation itself was executed by two young teenagers, 17-year-old Legaspi and 16-year-old Powers, against a group that, as far as Salazar and the others knew, numbered between 10 and 15 (or perhaps even more) men. As previously noted, Legaspi believed at least one of the men in the opposing group was armed. Considering the evidence that Salazar and his codefendants anticipated a highly mismatched confrontation between two opposing forces—a pair of teenagers on their side versus a large group of 10 to 15 men who were likely armed and had already attacked one VR gang member earlier in the day—it is highly improbable Salazar and his codefendants planned a mere verbal taunt or physical assault against the opposing side. Rather, it is more reasonable to infer from this evidence that

20

Legaspi planned to shoot and kill his attackers in retaliation for their earlier assault and Salazar knew of, and intended to promote, his plan to kill.

Based on all of this evidence, we conclude there was substantial evidence to support a reasonable finding the prosecution proved, beyond a reasonable doubt, that Salazar knew about Legaspi's plan to kill and provided assistance to him with the aim of aiding in the commission of the planned killings.[9]  Because Salazar does not challenge the sufficiency of the evidence of any other element of his murder and attempted murder convictions, we conclude the evidence was sufficient to support the denial of Salazar's petition for resentencing.

D. *Salazar is Not Entitled to a Remand for the Trial Court to Evaluate the Impact of his Relative Youth*

Salazar also claims that, even if the evidence is sufficient to support the order denying his petition for resentencing, a remand is warranted so the trial court may consider how, if at all, his youth affected whether he acted with implied malice.  As noted, Salazar was 21 years old at the time of the shootings.

In support of his request for a remand, Salazar relies on *People v. Pittman* (2023) 96 Cal.App.5th 400.  In that case, the trial court denied Pittman's petition to vacate his murder conviction on the ground he remained guilty of aiding and abetting implied malice murder.  (*Id.* at pp. 414–415.) Pittman appealed and argued the trial court erred by failing to consider his age at the time of the killing for which he was convicted (Pittman was 21

---

[9]     In light of our determination that the evidence was sufficient to prove that Salazar knew about Legaspi's plan to kill, and that he intended to further Legaspi's murderous plot, it is unnecessary for us to address the sufficiency of the evidence for the murder convictions under the alternative theory that Salazar aided and abetted implied malice murders.

years old at the time of the killing). (*Id.* at p. 416.) Relying on felony murder decisions concluding that a person's youth is a relevant factor in assessing whether she acts with reckless indifference to human life, the *Pittman* court ruled that youth is also relevant when assessing whether a person acts with implied malice. (*Id.* at pp. 416–419.) The court reasoned that "the implied malice mental state—conscious disregard for human life [citation]—is similar to the 'reckless indifference to human life' standard applicable to felony murder." (*Id.* at p. 417.) "Given these similarities," the *Pittman* court saw "no reason not to apply the principle articulated in the felony murder cases" to implied malice cases. (*Ibid.*) The court thus reversed the order denying the resentencing petition and remanded the matter for the trial court to consider how, if at all, Pittman's relative youth impacted his ability to form the mental state necessary for implied malice murder.

The legal principle applied in *Pittman* does not compel a reversal here or require us to remand the matter for further proceedings. In the earlier part of our opinion, we concluded there was substantial evidence to support a finding that Salazar aided and abetted the murders and attempted murders perpetrated by the shooter, Legaspi, because he knew of Legaspi's plan to kill and intended to further that homicidal plan. In other words, we concluded the evidence was sufficient to show that Salazar remained liable for aiding and abetting *express malice* murder. *Pittman* determined only that a person's youth is relevant when a court analyzes whether the person has acted with the mental state needed for *implied malice* murder. It does not stand for the proposition that a person's youth is relevant to the mens rea calculus in cases involving express malice murder, like the present one, and Salazar has not made any argument seeking to extend the rationale of *Pittman* to such cases.

22

In the absence of any such argument, or any legal authority expanding the *Pittman* rationale to cases involving express malice murder, we decline Salazar's alternative request for a remand to the trial court.

## IV

## DISPOSITION

The order is affirmed.

McCONNELL, P. J.

WE CONCUR:

O'ROURKE, J.

IRION, J.